736 A.2d 1246

IN THE MATTER OF THE GUARDIANSHIP OF K.H.O., A MINOR.

Argued November 9, 1998—Decided August 3, 1999.

338

342

*Mary C. Jacobson*, Assistant Attorney General, argued the cause for appellant, New Jersey Division of Youth & Family Services (*Peter Verniero*, Attorney General of New Jersey, attorney; *Lisa B. Landsman*, Deputy Attorney General, on the briefs).

*Dean T. Bennett*, Law Guardian, argued the cause for respondent K.H.O. (*Hartlaub, Dotten, Terry & Townsend*, attorneys).

*Melville D. Miller, Jr.*, argued the cause for respondent B.A.S. (*Mr. Miller*, President, Legal Services of New Jersey, attorney; *Mr. Miller, Beatrix W. Shear* and *Nancy Goldhill*, on the briefs).

*Cecilia M. Zalkind*, argued the cause for *amicus curiae* Association for Children of New Jersey.

*Lawrence S. Lustberg* and *Lori Outzs Borgen,* submitted a brief on behalf of *amicus curiae* New Jersey Women's Resource Panel on Substance Abuse (*Gibbons, Del Deo, Dolan, Griffinger & Vecchione,* attorneys).

*Lorraine M. Augostini,* Assistant Deputy Public Defender, *Janet L. Fayter,* Deputy Public Defender, and *Phyllis G. Warren,* Assistant Deputy Public Defender, submitted a brief on behalf of *amicus curiae* Law Guardian Office (*Ivelisse Torres,* Public Defender, attorney).

The opinion of the Court was delivered by

HANDLER, J.

The brief life story of this child, K.H.O., brings into sharp focus those circumstances that will impel the courts to terminate parental rights as a basis for a child's adoption. Determining when such termination is appropriate requires consideration of the statutory standard based on the best interests of the child. *N.J.S.A.* 30:4C–15.1(a).

The New Jersey Division of Youth and Family Services brought this termination action against the biological mother of K.H.O. The complaint was based on the statutory standards that codified this Court's decision in *New Jersey Division of Youth & Family Services v. A.W.,* 103 *N.J.* 591, 512 *A.2d* 438 (1986). That standard, considered also in the companion case *In re Guardianship of DMH,* 161 *N.J.* 365, 736 *A.2d* 1261 (*DMH* (II)), decided today, encompasses several criteria to determine the best interests of the child. The application of that standard in this case raises the issue of whether this child's drug addiction at birth, caused by the mother's prenatal drug use, endangered the health and development of the child. It also requires the Court to consider the legal effect of the mother's continuing inability to care for her child. Additionally, the application of this standard underscores the difficulties courts face in comparing the harm to the child that results from severing biological ties upon the termination of parental rights with the benefits of adoption.

## I

K.H.O. was born on August 31, 1993, suffering from heroin withdrawal, cleft palate syndrome, and respiratory difficulties. Her mother, B.A.S., had used drugs while pregnant. Following the birth of K.H.O., B.A.S. was referred to a drug treatment facility. She failed to complete that program. Since that time, B.A.S. has, without success, entered numerous drug treatment programs and undergone many psychological and substance-abuse evaluations provided by the Division of Youth and Family Services (DYFS).[1] Throughout K.H.O.'s young life, B.A.S. has continued to use drugs.

K.H.O. spent the first month of her life in the hospital. On September 29, 1993, her mother voluntarily placed her in foster care, and K.H.O. moved directly from the medical facility to her foster home. When K.H.O. was originally placed in foster care, her placement was treated as temporary. DYFS investigated various placement options for the child, including family members and friends of the biological mother. All were either unavailable or not suitable.

Despite her initial exposure to drugs, K.H.O. is healthy and appropriately developed for her age. She has had two successful surgeries to correct her cleft palate; she has a moderate hearing impairment. Since being placed in foster care nearly six years

---

[1] K.H.O. was late for and frequently missed scheduled evaluations. In December 1993, B.A.S. entered a drug treatment program but at the end of the program tested positive for heroin. In October 1994, B.A.S. entered an inpatient drug treatment program; she relapsed after completing treatment. In January 1995, B.A.S. entered an outpatient program, but failed to attend five of the scheduled intake appointments; she again tested positive for opiates and co-caine. At another outpatient program in July 1995, B.A.S.'s attendance was "inconsistent," and her involvement in therapy was characterized as "minimal." She had five urine tests in 1995, and four of them were positive for opiates. Reports submitted after oral arguments in this case reveal that in October 1998, B.A.S. entered a treatment program in a Georgia clinic and has tested negative for drug use, and continues to show progress in her rehabilitation. She acknowledged, however, that her recovery is precarious and she would not be able to remain drug free in New Jersey.

ago, K.H.O. has resided with the same foster family and has a close, loving relationship with her foster parents. Although the foster family is white and K.H.O. is black, the foster parents are aware of the problems facing interracial families; they participate in a program for interracial families and have two black foster children. K.H.O. also has a positive relationship with her biological mother.

In August 1996, DYFS filed an action under *N.J.S.A.* 30:4C–15.1(a), seeking to terminate B.A.S.'s parental rights so that K.H.O.'s foster parents could adopt her. B.A.S. contested the proposed adoption. The biological father, D.O., did not appear in the action and a default judgment was entered against him. The Superior Court, Chancery Division, appointed counsel for B.A.S. and a law guardian for K.H.O. The court also ordered substance abuse, psychological, and bonding evaluations to be conducted by a court-appointed expert.

The trial was held on March 17, 1997. B.A.S.'s DYFS caseworker and K.H.O.'s guardian both recommended that B.A.S.'s parental rights be terminated. The law guardian testified to the "very loving" relationship between K.H.O. and her foster family. The court-appointed psychologist, Dr. Sherwood Chorost, was unable to testify. In his initial report, dated January 2, 1997, Dr. Chorost identified the foster mother as K.H.O.'s "psychological parent." In his final report, he recommended that "the children be freed for adoption." The expert's written reports, together with the entire DYFS caseworker file, consisting of thirty eight documents, were entered into evidence. At the hearing, B.A.S. stated through her lawyer that she was "not really capable" and "needed more time" to take custody of K.H.O.

The court determined that the initial harm caused to K.H.O. *in utero* by her mother's drug use was sufficient to meet the first element of the best interests standard and that K.H.O. would suffer irreparable harm as a result of separation from her foster parents, meeting the fourth element of the test. On March 31, 1997, the trial court terminated B.A.S.'s parental rights under

*N.J.S.A.* 30:4C–15.1(a) and committed K.H.O. to the guardianship, care, custody and control of DYFS. The Appellate Division reversed and remanded, holding that neither the first nor the fourth prongs of the best interests standard had been met in this case. 308 *N.J.Super.* 432, 706 *A.*2d 226 (1998). This Court granted DYFS's petition for certification. 156 *N.J.* 405, 719 *A.*2d 637 (1998).

Following the appeal to the Appellate Division, which directed a remand, psychological and bonding evaluations of K.H.O., B.A.S. and K.H.O.'s foster family were conducted in October 1998. Dr. Ronald Silikovitz, a psychologist retained by Legal Services on behalf of B.A.S., and Dr. Elayne Weitz, a psychologist retained by DYFS, both made findings and recommendations that substantially confirm those of Dr. Chorost.[2] The psychologists both believed that the biological mother would not be able to provide a suitable home for K.H.O. and that K.H.O. would suffer significant and enduring harm if she were separated from her foster family. The experts found that K.H.O. had a positive relationship with her biological mother, but that her foster parents were her psychological parents. Both psychologists recommended adoption, but strongly suggested that continued contact between K.H.O. and B.A.S. be permitted.

## II

A parent's right to enjoy a relationship with his or her child is constitutionally protected. *In re Adoption of Children by L.A.S.*, 134 *N.J.* 127, 631 *A.*2d 928 (1993); *A.W., supra,* 103 *N.J.* at 599, 512 *A.*2d 438; *Stanley v. Illinois,* 405 *U.S.* 645, 92 *S.Ct.* 1208, 31 *L.Ed.*2d 551 (1972). The fundamental nature of the parent-child relationship, the permanency of the threatened loss, and the

---

[2] On notice to the parties, the reports of Dr. Silikovitz and Dr. Weitz were furnished to the Court at its request. The parties have not challenged or supplemented the reports. However, while the Court notes and refers to these reports, it does not rely on them in determining the sufficiency of the evidence in the disposition of this appeal.

complexity and subjectivity involved in evaluating parental fitness combine to define the nature of this right and the protections required to secure it. *Santosky v. Kramer,* 455 *U.S.* 745, 102 *S.Ct.* 1388, 71 *L.Ed.*2d 599 (1982).

We fully recognize the fundamental nature of parental rights and the importance of family integrity. The Legislature has declared that "[t]he preservation and strengthening of family life is a matter of public concern as being in the interests of the general welfare." *N.J.S.A.* 30:4C–1(a). The protection of parental rights continues when a child is placed in foster care. *In re Guardianship of J.C.,* 129 *N.J.* 1, 9, 608 *A.*2d 1312 (1992). We have consistently imposed strict standards for the termination of parental rights. *See id.* at 10, 608 *A.*2d 1312; *In re Guardianship of K.L.F.,* 129 *N.J.* 32, 608 *A.*2d 1327 (1992); *A.W., supra,* 103 *N.J.* 591, 512 *A.*2d 438. Presumptions of parental unfitness may not be used in proceedings challenging parental rights, *L.A.S., supra,* 134 *N.J.* at 132, 631 *A.*2d 928, and all doubts must be resolved against termination of parental rights. *In re Adoption of D.,* 61 *N.J.* 89, 93, 293 *A.*2d 171 (1972).

Parental rights, though fundamentally important, are not absolute. The constitutional protection surrounding family rights is tempered by the State's *parens patriae* responsibility to protect the welfare of children. *J.C., supra,* 129 *N.J.* at 10, 608 *A.*2d 1312. The balance between parental rights and the State's interest in the welfare of children is achieved through the best interests of the child standard. That standard provides that parental rights may be terminated upon a showing that:

(1) The child's health and development have been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his foster parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made diligent efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.
[*N.J.S.A.* 30:4C–15.1(a) (1998).] [3]

The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests. As we pointed out in *L.A.S., supra,* parental fitness is the key to determining the best interests of the child. 134 *N.J.* at 139, 631 *A.2d* 928. The considerations involved in determinations of parental fitness are "extremely fact sensitive" and require particularized evidence that address the specific circumstances in the given case. *Ibid.*

The statute requires that the State demonstrate harm to the child by the parent. Harm, in this context, involves the endangerment of the child's health and development resulting from the parental relationship. *N.J.S.A.* 30:4C–15.1(a)(1). As explained by the Court in *A.W., supra,* 103 *N.J.* at 604–10, 512 *A.2d* 438, the best interests standard does not concentrate on a single or isolated harm or past harm as such. Although a particularly egregious single harm can trigger the standard, the focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development.

The State must show not only that the child's health and development have been and continue to be endangered, but also that the harm is likely to continue because the parent is unable or unwilling to overcome or remove the harm. *N.J.S.A.* 30:4C–15.1(a)(2). That inquiry is aimed at determining whether the parent has cured and overcome the initial harm that endangered the health, safety, or welfare of the child, and is able to continue a parental relationship without recurrent harm to the child. *J.C., supra,* 129 *N.J.* at 10, 608 *A.2d* 1312; *A.W., supra,* 103 *N.J.* at 606–07, 512 *A.2d* 438. Alternatively, under this second criterion, it may be shown that the parent is unable to provide a safe and

---

[3] *N.J.S.A.* 30:4C–15.1 was amended in 1999. *L.* 1999, *c.* § 3, § 30. The amendments do not bear on the disposition of the case.

stable home for the child and that the delay in securing permanency continues or adds to the child's harm. *N.J.S.A.* 30:4C–15.1(a)(2).

### A.

The trial court found that B.A.S.'s chronic drug abuse caused K.H.O.'s addiction at birth and that this constituted a harm to that child. In addition, and as an added factor in support of its finding of harm, the court found that B.A.S.'s continuing addiction prevented her from providing care and nurture or a stable home for K.H.O., which further endangered the child. Accordingly, the court found that the first prong of the best interests standard had been satisfied. *N.J.S.A.* 30:4C–15.1(a)(1). The Appellate Division disagreed. It determined that B.A.S.'s actions, resulting in the birth of a drug-addicted baby, did not amount to the showing of physical abuse, serious emotional injury, or developmental retardation required under *A.W., supra,* 103 *N.J.* at 604–05, 512 *A.*2d 438. The appellate court ruled that the infant, though born addicted to drugs and suffering symptoms of withdrawal, suffered no lasting harm, ostensibly because she could be cured of her addiction and relieved of her suffering.

 We conclude that a child born addicted to drugs and suffering from the symptoms of drug withdrawal as a result of her mother's substance abuse during pregnancy has been harmed by her mother and that harm endangers the child's health and development. That determination satisfies the first prong of the best interests standard. *N.J.S.A.* 30:4C–15.1(a)(1).

 Drug use during pregnancy, in and of itself, does not constitute a harm to the child under *N.J.S.A.* 30:4C–15.1(a)(1). *See State v. Kruzicki,* 209 *Wis.*2d 112, 561 *N.W.*2d 729 (1997) (holding that state may not take custody over unborn child even where mother endangers fetus by cocaine use). Prenatal drug use does not, without more, establish parental unfitness or an inability to parent. *See In re Valerie D.,* 223 *Conn.* 492, 613 *A.*2d 748, 761

(1992) (ruling that pre-natal drug use resulting in infant withdrawal symptoms cannot be sole basis for termination of parental rights); Sandra A. Garcia, *Drug Addiction and Mother/Child Welfare*, 13 *J. Legal Med.* 129, 167 (1992) (arguing that absent additional indications, drug use during pregnancy is not a proxy for parental unfitness). We emphasize that the purpose of termination is always to effectuate the best interests of the child, not the punishment of the parent. *In re Guardianship of A.A.M.*, 268 *N.J.Super.* 533, 549, 634 *A.*2d 116 (App.Div.1993) (Kestin, J., concurring) ("[T]he purpose of termination is to protect the child from future harm from the 'parental relationship,' not to punish the parent for past transgressions against the child *in utero* or *in esse*.") (citation omitted). The child is harmed by the mother's drug use, however, when that drug use results in the child being born addicted to drugs with the attendant suffering caused by such addiction.

The injury suffered at birth from fetal drug addiction has been graphically documented. Maternal drug use can result in life-threatening cardiovascular and central nervous system complications, low birth weight, lower gestational age at delivery, irritability, convulsions, poor feeding patterns, increased tremulousness and startles. Judith Larsen et al., *Medical Evidence in Cases of IntraUterine Drug and Alcohol Exposure*, 18 *Pepp. L.Rev.* 279, 292–294 (1991); Scott N. MacGregor et al., *Cocaine Use During Pregnancy: Adverse Perinatal Outcome*, 157 *Am.J. Obstetrics & Gynecology* 686 (1987). Infants suffering withdrawal after birth display symptoms such as high pitched cries, tremors, seizures, sweating, skin abrasions and gastrointestinal upset. *Larsen, supra*, 18 *Pepp. L.Rev.* at 292. Some question the long-term effects of fetal drug addiction. Linda C. Mayes et al., *The Problem of Prenatal Cocaine Exposure: A Rush to Judgment*, 267 *J.A.M.A.* 406, 406–408 (1992) ("[A]vailable evidence from the newborn period is far too slim and fragmented to allow any clear predictions about ... the course and outcome of child growth and development."). Nevertheless, the immediate and short-term effects are drastic. When a child is born drug addicted and suffering from

withdrawal symptoms, the child has been harmed and that harm necessarily continues after the birth of the child, endangering her health and development. *See, e.g., Texas Dep't of Human Servs. v. White,* 817 *S.W.*2d 62 (Tex.1991) (holding that child born addicted to drugs is evidence of neglect in termination context); *In re Troy D.,* 215 *Cal.App.*3d 889, 263 *Cal.Rptr.* 869 (1989) (holding that child born addicted as result of mother's actions has suffered purposeful or negligent injury); *accord State v. Zimmerman,* 1996 *WL* 858598 (Wis.Cir.1996) (holding that mother who consumed large quantities of alcohol just prior to infant's birth could be criminally liable when child was born with dangerously high levels of alcohol in her system). We therefore recognize that an infant born addicted to drugs and suffering the resultant withdrawal symptoms has suffered harm that endangers her health and development within the meaning of *N.J.S.A.* 30:4C–15.1(a)(1).

K.H.O. was born drug-addicted and remained hospitalized for one month before she could be released into foster care.[4] The first prong of the best interests test has been clearly and convincingly satisfied in this case. The implication of the Appellate Division's determination that K.H.O. suffered no harm as a result of her addiction is that the harm caused K.H.O. had no lasting effects and did not further endanger her health and development. Implicit in that reasoning is that the child's recovery and apparent progress in foster care neutralizes any finding that B.A.S.'s own parental unfitness had endangered her child. We agree with the Appellate Division's analysis in *New Jersey Division of Youth & Family Services v. B.G.S.,* where the court rejected the biological mother's contention that "the first prong of the statute could not have been met because the [child's] mental and emotional well-

---

[4] We note that in his 1998 psychological evaluation, Dr. Silikovitz observed that K.H.O.'s short attention span may be the result of her intrauterine drug exposure and subsequent addiction. We do not, however, consider that as evidence in this appeal.

being had improved in foster care despite her visits." 291 *N.J.Super.* 582, 591, 677 *A.*2d 1170 (1996).

The harm shown under the first prong must be one that threatens the child's health and will likely have continuing deleterious effects on the child. That requirement is reinforced by the second prong of the statutory standard, which focuses on the parent's ability to overcome the harm to the child. Here, the child's addiction and symptoms of withdrawal, coupled with her mother's failure to provide continuing care for her child or to take any measures to help her child overcome her suffering, satisfy the first prong of the statutory test.

■ The second prong of the statutory standard relates to parental unfitness. That may be established in several ways. It may be demonstrated that the parent is "unwilling or unable to eliminate the harm" that has endangered the child's health and development. *N.J.S.A.* 30:4C–15.1(a)(2). Parental unfitness may also be demonstrated if the parent has failed to provide a "safe and stable home for the child" and a "delay in permanent placement" will further harm the child. *Ibid.*

■ The record discloses that B.A.S., herself addicted, could do nothing to cure or alleviate her daughter's condition. Because a child born drug addicted and suffering from withdrawal symptoms has been endangered, and because in many cases the parent herself cannot help in her child's care or cure, the second element of the best interests standard must focus on the measures taken by the parent after the child's birth to maintain the parent-child relationship and to foster an environment leading to normal child development. The Appellate Division in *B.G.S., supra,* 291 *N.J.Super.* at 592, 677 *A.*2d 1170, observed that "harms attributable to the biological parent include the prolonged inattention to a child's needs, which encourages the development of a stronger, 'bonding relationship' to foster parents," which if severed could cause the child profound harm. *Cf. In re A.,* 277 *N.J.Super.* 454, 469, 649 *A.*2d 1310 (App.Div.1994) (finding that the biological mother had eliminated potential harm to a child born drug addict-

ed through rehabilitation and parenting classes). Thus, the second prong may be met by indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug abuse, the inability to provide a stable and protective home, the withholding of parental attention and care, and the diversion of family resources in order to support a drug habit, with the resultant neglect and lack of nurture for the child.

Initially, the court-appointed psychologist was optimistic about B.A.S.'s ability to recover from her addiction and to assume maternal responsibility with continued visitation—"*when [she] can demonstrate a stable social and drug free lifestyle.*" He did not, however, believe that B.A.S. was ready at that time to take custody of K.H.O. Dr. Chorost ultimately concluded that B.A.S. "has perpetuated a behavioral pattern" of chronic, unresolved drug abuse that prevented him from recommending that she be given custody. B.A.S. herself conceded that she was unable to care for her child or assume custody. Although B.A.S. has visited her child and maintained a limited but positive relationship with her, B.A.S. has been consistently unable to take any responsibility for K.H.O.'s parental care. There is no indication that B.A.S. will successfully rehabilitate herself sufficiently to care for her daughter; this finding is affirmed by her positive drug test just prior to trial and by the court appointed expert's report.[5]

That K.H.O. was born addicted was only the beginning of her endangerment from this parent-child relationship. B.A.S.'s inability to take custody of and care for her child and to provide a safe and stable home at any time since the child's birth in 1993 demonstrates parental unfitness and constitutes a continuing harm

---

[5] We note that pending this appeal subsequent drug evaluations have indicated that K.H.O. has made progress in her rehabilitation. *Supra* at 344 n. 1, 736 *A.2d* at 1249 n. 1. We also note, however, that Dr. Silikovitz's 1998 report indicates: "A case goal of reunification of [K.H.O.] with [B.A.S.] is not viable or appropriate to consider." Dr. Weitz's report also observes that "a risk of physical and emotional neglect exists should reunification occur." We do not consider these reports to be part of the record or to be evidential, nor do we consider them to be grounds for our determination of this appeal.

to the child under *N.J.S.A.* 30:4C–15.1(a)(2). In addition, the evidence supports the conclusion that the delay caused by B.A.S.'s failure to assume a responsible parental role in securing permanent placement of K.H.O. will itself harm the child to the extent that it results in the disruption or weakening of other bonds the child might form, such as a healthy relationship with her foster parents. Accordingly, we find that the second prong of the best interests standard has been met in this case.

We note also that the third element of the best interests standard requires DYFS to undertake diligent efforts to reunite the family. *N.J.S.A.* 30:4C–15.1(a)(3). That prong of the standard contemplates efforts that focus on reunification of the parent with the child and assistance to the parent to correct and overcome those circumstances that necessitated the placement of the child into foster care. *DMH* (II), *supra,* 161 *N.J.* at 386–87, 736 *A.*2d 1272. Here, DYFS caseworkers attempted to find maternal or paternal relatives or friends who would care for K.H.O., but all were either incapable of taking custody of the child or unwilling to care for her. DYFS encouraged continued parental visits. DYFS was also supportive of the foster mother developing a positive relationship with B.A.S. The foster mother wrote B.A.S. letters describing K.H.O.'s progress and encouraged a positive relationship between biological mother and daughter. The DYFS caseworker monitored B.A.S.'s fairly consistent bi-monthly visits with K.H.O. DYFS also sent B.A.S. to numerous drug treatment programs, but she failed to complete them and had been consistently unable to recover from her addiction for four years at the time the termination action was brought. Therefore, this case presents clear and convincing evidence that DYFS undertook diligent efforts to enable B.A.S. to become a functioning parent and caretaker of her child, as required under *N.J.S.A.* 30:4C–15.1(a)(3).

### B.

The fourth prong of the best interests of the child standard requires a determination that termination of parental rights

will not do more harm than good to the child. *N.J.S.A.* 30:4C–15.1(a)(4). The appellate court found that this record does not "demonstrate clearly and convincingly that terminating [K.H.O.'s] relationship with her biological family will not harm her, either presently, or perhaps more critically, in the long run." 308 *N.J.Super.* at 455, 706 *A.*2d 226. It therefore rejected the trial court's finding that termination in this case would not do more harm than good. We disagree with the Appellate Division's interpretation of this statutory standard and its assessment of the facts.

We have previously noted that "[t]he risk to children stemming from the deprivation of the custody of their natural parent is one that inheres in the termination of parental rights and is based on the paramount need the children have for permanent and defined parent-child relationships." *J.C., supra,* 129 *N.J.* at 26, 608 *A.*2d 1312. Therefore, the fourth prong of the best interests standard cannot require a showing that no harm will befall the child as a result of the severing of biological ties. The question to be addressed under that prong is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents.

To determine whether the comparative harm is proscribed by the fourth prong in a case involving a child in foster care, such as K.H.O., the court must inquire into the child's relationship both with her biological parents and her foster parents. "Weighing the potential harm that terminating [the child's] relationship with her mother against that which might come from removing her from her foster home is painfully difficult, but it is a decision that necessarily requires expert inquiry specifically directed to the strength of each relationship." *J.C., supra,* 129 *N.J.* at 25, 608 *A.*2d 1312.

Here, the court-appointed expert, Dr. Chorost, found that K.H.O.'s primary bond is with her foster parents, who are her

psychological parents. K.H.O. has a much weaker, secondary bond with her biological mother. In her visits with her biological mother, K.H.O.'s initial anxiety was mitigated by the knowledge that her foster mother will "be there for her when she gets back." Dr. Chorost concluded that B.A.S. could not assume custody and he did not recommend unification of B.A.S. with her child.[6]

There is ample evidentiary basis for crediting the expert's conclusion. B.A.S.'s drug problem severely limits her ability to form an enduring bond with her child. Although she is still capable of maintaining a limited benign relationship with her child, she cannot strengthen or extend that bond and function as a parent in providing for K.H.O.'s physical and emotional needs and assuring her normal development. She has been unable to do so for an extended period of nearly six years, despite diligent and extensive efforts by DYFS. *Cf. K.L.F., supra,* 129 *N.J.* at 35, 608 *A.*2d 1327 (allowing reunification where mother was able to provide stable home environment for child after a little over a year); *In re A., supra,* 277 *N.J.Super.* at 469, 649 *A.*2d 1310 (allowing reunification where mother was able to rehabilitate herself sufficiently to take custody of child within two-and-a-half years).

The Appellate Division acknowledged that the record provides no "reasonable basis for concluding that B.[A.]S. will ever be able" to take custody of her child. This mother's inability to provide any nurturing or care for her daughter for the prolonged period is a harm to K.H.O. that is cognizable under the best interests standard. *A.W., supra,* 103 *N.J.* at 604–11, 512 *A.*2d 438. As time passes, the bond between K.H.O. and her foster mother, the only mother she has ever known, grows stronger. A qualified expert, appointed by the court, had a full opportunity to make a compre-

---

[6] We note that both Dr. Silikovitz and Dr. Weitz recommended strongly against unification, finding that B.A.S. cannot provide adequate care for her daughter; K.H.O.'s bond with her foster parents remains her most enduring, and her relationship with her mother remains positive, if limited. While those opinions parallel that of Dr. Chorost, they are not evidence of record and are not relied on in our determination and disposition of this appeal.

hensive, objective and informed evaluation of K.H.O.'s relationship both with her foster mother and with her biological mother. *See J.C.,* 129 *N.J.* at 19, 608 *A.*2d 1312. He concluded that termination is in K.H.O.'s best interests.[7]

We agree with the courts below that B.A.S. is not capable of being a parent, and has provided no reliable indication, despite some apparent progress, that she will ever be in the foreseeable future. Recognizing the natural tendency to want to continue working with parents to restore the family unit, we have cautioned that placement plans must not lose sight of time from the perspective of the child's needs. *A.W., supra,* 103 *N.J.* at 607–08, 512 *A.*2d 438; *B.G.S., supra,* 291 *N.J.Super.* at 592, 677 *A.*2d 1170 (finding in case where mother was unable to care for child for prolonged period due to substance abuse, and would not be able to take custody for an indefinite period, it would not be in child's best interests to "prolong resolution of his status by extending indefinitely his current foster care placement"). The courts must consider the child's age, her overall health and development, and the realistic likelihood that the parent will be capable of caring for the child in the near future. As we explained in *A.W., supra,*

We cannot determine how much the inability of the parents to transfer affection or care to their children may be attributed to the parents' being short-changed by either nature or society. We are confronted with a situation in which children have been injured. We know that we must balance that injury with the realization that the natural family or its extension will, in many cases, be the best resource that society can afford children. But here there is simply no evidence that the parents will be able to care for the children in the near future. Time is running out for these children.

[*Id.* at 614–15, 512 *A.*2d 438.]

In applying these statutory standards, we are cognizant of New Jersey's strong public policy in favor of permanency. In all our guardianship and adoption cases, the child's need for permanency and stability emerges as a central factor. *J.C., supra,* 129 *N.J.* at 26, 608 *A.*2d 1312 (acknowledging "the paramount need children

---

[7] As Dr. Silikovitz, writing in 1998, observed: "[t]he argument that [K.H.O.] has been in limbo too long already is compelling."

have for permanent and defined parent-child relationships"); *A.W., supra,* 103 *N.J.* at 610, 512 *A.*2d 438 (emphasizing child's deep need for continuing association with nurturing adult). The trend over the last thirty years has been towards foster care reforms that place limits on the amount of time a parent may have to correct conditions at home in anticipation of reunification. *See, e.g.,* Michael S. Wald, *State Intervention on Behalf of "Neglected" Children: Standards of Removal of Children in Foster Care, and Termination of Parental Rights,* 28 *Stan. L.Rev.* 623 (1970). As early as 1978, the New Jersey Legislature acknowledged the importance of providing for permanency for children in foster care with the enactment of the Child Placement Review Act, which established procedures for regular review of each child's placement status and permanency planning. *N.J.S.A.* 30:4C–50 to–65 (*L.* 1977, *c.* 424); *see also, N.J.S.A.* 30:4C–53.1(d) (providing "a clear and consistent policy which limits the repeated placement of children in foster care and promotes the eventual placement of these children in stable and permanent homes"); *N.J.S.A.* 30:4C– 53.3 (requiring State to explore alternative permanent plans, such as adoption, for children who are subject of repeated foster care placements, immediately upon placement reentry); *N.J.S.A.* 30:4C–60(d) (requiring Child Placement Review Board to recommend another placement plan for any child that has been in placement for one year).

Recent legislative amendments have strengthened this policy of permanency for children. In 1991, the Legislature amended *N.J.S.A.* 30:4C–15(d) to permit termination of parental rights where a child has been in placement for more than one year, and the family has failed to remedy the problems that caused placement, despite DYFS's "diligent efforts" to assist reunification. *L.* 1991, *c.* 275, § 3. This year, the Legislature enacted measures to conform New Jersey law to the federal Adoption and Safe Families Act of 1997. *L.* 1999, *c.* 53. Among other requirements, that legislation requires that a court hold a dispositional hearing for children who have been in foster care for more than twelve

months. 42 *U.S.C.A.* §§ 671(16), 675(5)(A)(ii); *N.J.S.A.* 30:4C–15 (*L.* 1999, *c.* 53, § 29).

The Appellate Division was understandably reluctant to terminate B.A.S.'s parental rights. Caution is appropriate because termination of parental rights does not automatically lead to adoption or other comparable permanent arrangements. *See* Matthew B. Johnson, *Examining Risks to Children in the Context of Parental Rights Termination Proceedings,* 22 *N.Y.U. Rev. L. & Soc. Change* 397, 413 (1996); Martin Guggenheim, *The Effects of Recent Trends to Accelerate the Termination of Parental Rights of Children in Foster Care—An Empirical Analysis in Two States,* 29 *Fam. L.Q.* 121 (1995) (reporting on a study that found many children whose parents' rights are terminated are not being adopted). This Court has noted other dangers of placing too much emphasis on continuity of support as the basis for keeping children in foster care. "Parents, particularly those with limited incomes and unstable housing and work experiences, should be able to turn to the foster-care system without fear of losing their children." *J.C., supra,* 129 *N.J.* at 21, 608 *A.*2d 1312. We have expressed concerns that the rush towards permanency creates the risk of institutional bias, which may "tilt the process in favor of the agency and its social workers and foster parents," *ibid.,* and "unfairly weigh the process against parents with fewer material resources." *K.L.F., supra,* 129 *N.J.* at 45, 608 *A.*2d 1327. Further, we are aware that disadvantaged women are more likely to be reported for abuse and to be tested for drug use. *See* Ira J. Chasnoff, et al., *The Prevalence of Illicit–Drug or Alcohol Use During Pregnancy and Discrepancies in Mandatory Reporting in Pinellas County, Florida,* 322 *New Eng. J. Med.* 1202 (1990) (discussing study that black women who used controlled substances during pregnancy were ten times more likely than white women to be reported to authorities, even though white women were slightly more likely to have used drugs at the time of their first prenatal visit).

The Appellate Division perceptively and reasonably considered this serious implication by referring to the importance of "nurture or roots" even when the biological parent cannot care for the child herself, 308 *N.J.Super.* at 442, 706 *A.*2d 226 (citing *L.A.S, supra,* 134 *N.J.* at 140, 631 *A.*2d 928), and by alluding to the risk of race and class bias. *Id.* at 446, 706 *A.*2d 226. This child's predicament is extreme, despite her life in foster care having been stable, because K.H.O. has never lived outside her foster parents' home and her mother has never been in a position to take custody of her for even a short time. K.H.O. is fortunate in that her first foster home placement was also her last, and that her foster parents are willing to adopt her. But the success of the foster care system in this case does not alter the fact that B.A.S. has not contributed to her daughter's development or nurturing. There can be no genuine replacement or substitute for the deprivation of nurture by the natural parent, even though the effects of such deprivation can be redressed and mitigated.

In concluding that long-term foster care may be the best alternative for this child, the Appellate Division incorrectly treated long-term foster care on a par with the creation of permanent lasting ties with either the natural parents or the adoptive parents. That does not accord with the best interests of the child as currently reflected in our law. *See N.J.S.A.* 30:4C–26.11 (stating public policy favoring reunification or adoption over long-term foster care). Long-term foster care is the exception to the general rule favoring adoption, and is available under only very limited circumstances, not present here.[8] K.H.O., who is only five years old, presents no unique circumstances that might require her placement in long-term foster care rather than adoption. In

---

[8] The Long Term Foster Care Act was not intended to apply to children such as K.H.O. That Act provides that long-term foster care custody of a child is available where the child has reached the age of twelve, or where "unique circumstances" make the age of the child irrelevant; efforts have been made to reunite the child with his biological family; efforts have been made to place the child for adoption for at least one year; and the child has resided with the person seeking long-term foster care for at least one year. *N.J.S.A.* 30:4C–26.13.

focusing on the negative aspects of the permanency movement, the Appellate Division failed to appreciate that K.H.O. is offered a permanent placement with the parents who have provided her care and nurturing for nearly six years, under whose care she has flourished, with whom she has established a strong bond, and whose loss would be harmful to her. Adoption is indeed in K.H.O.'s best interests, and her foster family, under whose care she has thrived, is ready and willing to adopt her. We conclude that the evidence clearly and convincingly establishes that terminating the parental rights of B.A.S. will not do more harm than good to K.H.O.

Although the termination of parental rights in this case is supported by clear and convincing evidence and should be required as a basis for the child's adoption, we note, further, that the Appellate Division discussed and rejected the possibility for B.A.S. to have continued contact with her child after her adoption. That kind of arrangement has been referred to as an "open adoption." It reflects an agreement between the adoptive parents and one or more members of the child's biological family permitting visitation after the child has been formally adopted. *In re Adoption of a Child by D.M.H.*, 135 *N.J.* 473, 492–93, 641 *A.*2d 235 (1994) (*D.M.H.* (I)). In *J.C., supra,* we observed that "[a]lthough natural parents can be a disruptive influence for children who have been adopted, some commentators and psychologists believe that trying to eliminate the natural parents from the children's lives and memory is impossible, and therefore wrong." 129 *N.J.* at 20, 608 *A.*2d 1312. We have declined to resolve the question of the validity or enforceability of an open adoption, noting that the Legislature had deferred its consideration and that "the issue of open adoption represents a significant policy issue which should be addressed in separate legislation." *D.M.H.* (I), *supra,* 135 *N.J.* at 493–94, 641 *A.*2d 235 (quoting Senate Judiciary Committee, *Statement to Senate, No.* 685 (1993)).

Our adoption statute provides that "[t]he entry of a judgment of adoption shall ... terminate all parental rights and responsibili-

ties of the parent towards the adoptive child. . . ." *N.J.S.A.* 9:3–50(a). Some states prohibit open adoption agreements, reasoning that they are incompatible with statutory adoptions. *Matter of Adoption of Topel,* 571 *N.E.*2d 1295, 1298 (Ind.Ct.App.1991) (holding that open adoption violates statutory requirement of finality of adoption and invalidating consent to adoption where visitation agreement was reached); *In re Adoption of Zschach,* 75 *Ohio St.*3d 648, 665 *N.E.*2d 1070 (1996) (holding that open adoption violates statutory requirement of finality of adoption and invalidating visitation agreement); *Huffman v. Grob,* 172 *Cal.App.*3d 1153, 218 *Cal.Rptr.* 659 (1985) (holding that adoption statute bars claims for visitation from former relatives). Other states, fearing that open adoption agreements may be used as an inducement to compromise, have held that there is no legal impediment to informal open adoption arrangements, but declined to enforce such arrangements judicially. *In the Matter of the Welfare of D.D.G.,* 558 *N.W.*2d 481, 485 (Minn.1997).

Agreements that permit continued contact between biological relatives and adoptive parents and are entered into with full counselling and advice, are completely voluntary and mutual, and are in the best interests of the child, may be recognized. *See Kattermann v. DiPiazza,* 151 *N.J.Super.* 209, 376 *A.*2d 955 (App. Div.1990) (permitting visitation to biological mother whose child was adopted by maternal grandparents where it was in child's best interests). We acknowledge that such arrangements cannot be judicially enforced, given the potential for disruption of the child's family life under such arrangements and the fact that under the adoption laws the adoptive parents' rights are paramount. *In re Guardianship of R.O.M.C.,* 243 *N.J.Super.* 631, 634, 581 *A.*2d 113 (App.Div.1990) (permitting voluntary contact between mentally-ill biological parent and adopted child but declining to enforce visitation judicially). Nevertheless, where, as here, in a foster care context, there has been continued and positive contact between the foster and biological parents in an atmosphere of trust, we cannot but hope that such a voluntary, informal agreement after adoption

will allow the child to continue having both of these parental figures in her life.

## III

We hold that a child's health and development are endangered when she is born drug addicted and her mother cannot care for her at birth. *N.J.S.A.* 30:4C–15.1(a)(1). We recognize that the continuing inability of the mother to overcome her own addiction in order to care for her child constitutes endangerment of the child. *Ibid.* We further recognize that the continuing inability of the mother under such circumstances to care for her child or to provide a safe and stable home for her child meets the standards of parental unfitness required under *N.J.S.A.* 30:4C–15.1(a)(2). We hold, also, that if there is clear and convincing evidence that the child will suffer substantially from a lack of stability and a permanent placement and from the disruption of her bond with foster parents, this will satisfy *N.J.S.A.* 30:4C–15.1(a)(2). Finally, we determine that where it is shown that the bond with foster parents is strong and, in comparison, the bond with the natural parent is not as strong, that evidence will satisfy the requirement of *N.J.S.A.* 30:4C–15.1(a)(4) that termination of parental rights will not do more harm than good to the child. Lastly, we find that in this case DYFS used diligent efforts to reunite the child with her biological mother, as required by *N.J.S.A.* 30:4C–15.1(a)(3).

In accordance with our determination that the elements of *N.J.S.A.* 30:4C–15.1(a) have been met with clear and convincing evidence, we reverse the Appellate Division and reinstate the trial court's order terminating the parental rights of B.A.S. in respect of K.H.O.

O'HERN, J., concurring.

I concur in the judgment of the Court, but for different reasons. I agree that an injury inflicted on an unborn child by its mother may be considered as part of the harm suffered by a child under the first prong of the four-part test, *N.J.S.A.* 30:4C–15.1(a), neces-

sary to terminate parental rights. I disagree that in and of itself, giving birth to a drug-dependent child qualitatively establishes the first prong of the test. (Recall the cases of mothers who leave their children in locked cars at malls. A single incident of neglect on the part of a parent is not enough normally to terminate parental rights.) Rather, I agree with the Appellate Division that the trial court's findings were incomplete and inadequate to sustain a judgment terminating parental rights. 308 *N.J.Super.* 432, 453, 706 *A.*2d 226 (1998). Except for perhaps placing too much emphasis on the possibility of long-term foster care, the Appellate Division conscientiously applied the four-part test for the termination of parental rights.[1] After thorough review, the court properly remanded the matter for further consideration.

In hindsight, we now have the benefit of the remand ordered by the Appellate Division. The supplemental psychological evaluation reports, submitted October 10, 1998, convincingly establish that "[a] case goal of reunification of [K.H.O.] with [her biological mother B.S.] is not viable or appropriate to consider.... [K.H.O.] should be adopted by her foster parents." B.S. is currently in an out-patient drug rehabilitation program in Georgia. Although the results of her most recent drug tests indicate that she is negative for both opiates and ethanol, B.S. acknowledges that she would not be able to continue her progress in New Jersey. Although she has now apparently changed her position, B.S. conveyed to the trial court and the psychologist that she is prepared to surrender her parental rights; her only hesitation is based on the concern that there will be no guarantee that she will be permitted future contact with K.H.O. The record clearly indicates that B.S. is honest enough to realize that she cannot realistically perform her parental obligations within the time frame of her child's needs. All that she asks is that she be allowed continued visitation. We should be able to accommodate her plea to play a part in her child's life. *See In re Adoption of*

---

[1] We note that *L.* 1999, *c.* 53, § 30 (eff.Mar. 31, 1999) amended *N.J.S.A.* 30:4C–15.1 placing an emphasis on permanent placement.

*Child by D.M.H.,* 135 *N.J.* 473, 641 *A.*2d 235, *cert. denied sub nom. Hollingshead v. Hoxworth,* 513 *U.S.* 967, 115 *S.Ct.* 433, 130 *L.Ed.*2d 345 (1994) (explaining that "[n]otwithstanding the absence of legislation, voluntary and informal open-adoption arrangements do exist and, for some families, such arrangements may balance the needs of biological and adoptive parents.") (citation omitted).

*For reversal and reinstatement*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.