# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0295-25

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

J.H. (deceased),[1]

     Defendant,

and

L.B.,

     Defendant-Appellant.

_____

IN THE MATTER OF A.L.B.,
a minor.

_____

     Submitted April 21, 2026 – Decided April 29, 2026

     Before Judges Susswein and Chase.

---

[1] We use initials and pseudonyms to protect the privacy of the family. R. 1:38-3(d)(12).

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FG-03-0012-25.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Richard Sparaco, Designated Counsel, on the brief).

Jennifer Davenport, Attorney General, attorney for respondent (Deborah H. Wassel, Assistant Attorney General, of counsel; Lakshmi Barot, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant L.B. ("Leon"), appeals from a September 5, 2025 order terminating his parental rights to A.L.B. ("Ally"). We affirm.

I.

In September 2023, a referral was made to the Division of Child Protection and Permanency ("DCPP") stating that J.H. ("Jean")[2], pregnant at the time, was allegedly using heroin and crystal methamphetamine, and the baby's father, Leon, had recently been released from prison after a lengthy out-of-state sentence. Allegations of domestic violence between Jean and Leon were also

---

[2] Jean died before trial in this matter.

reported. DCPP had been involved with Jean since 2005. Following investigation, DCPP put a safety protection plan in place.

In October 2023, Ally was born. Ally immediately began experiencing withdrawal symptoms and was treated with morphine. Therefore, DCPP was again contacted. Leon denied any drug use other than marijuana and expressed no concerns about Jean's parenting. Leon and Jean were homeless and initially planned to live with Jean's mother, who declined to have them. She also refused to take Ally because she had custody of Jean's other children. Instead, she recommended members of her church, B.D. and H.D., as possible placement options, and DCPP placed Ally with them when she was twelve days old. Ally has remained in their care since that time.

DCPP then explored other relatives for placement. Leon's mother was ruled out due to homelessness and a history with DCPP. Leon's brother, though initially considered, was ultimately ruled out because of his criminal history and he also declined placement. Other relatives did not respond or follow through.

On November 9, 2023, the trial court granted DCPP custody of Ally. Both Leon and Jean consented to participate in substance abuse evaluations, random urine screens, parenting classes, and began supervised visitation.

A-0295-25

During late 2023 and early 2024, Leon and Jean would sometimes confirm that they planned to attend visits, and then would fail to attend, leaving Ally to be transported back and forth without a visit. The couple remained homeless, residing in hotels provided by social services. Both parents missed urine screens.

Leon later tested positive for marijuana and was recommended for intensive outpatient treatment. He attended a psychological evaluation with Dr. Genevieve Chaney in January 2024. When asked about his schizoaffective disorder, he claimed that he faked symptoms to obtain housing. However, Leon admitted to having significant problems with stress. Dr. Chaney advised Leon to follow the recommendation from his substance abuse evaluation, submit to drug screens, attend a psychiatric evaluation, engage in parenting education, provide releases for his prior hospitalizations, and if he was reunified with Ally, recommended that DCPP provide in-home services. Leon had inconsistent attendance and engagement in these services and was discharged from treatment programs for non-compliance.

Leon attended a psychiatric evaluation in March 2024 at It Takes a Family and denied any history of current or past psychiatric diagnoses, hospitalizations, mental health symptoms, and current or past substance use other than marijuana.

4

Evaluators recommended individual therapy, medication management, parenting training, a substance abuse evaluation, a medical evaluation, and a referral to social services for housing and employment assistance. Leon failed to complete any of these recommendations.

Leon tested positive for methamphetamines, marijuana, amphetamines, alcohol, and fentanyl throughout the rest of 2024. He entered and left detoxification programs and treatment multiple times and did not complete parenting education courses. Referrals for therapy and supervised visitation were closed due to lack of engagement.

In August 2024, Leon was arrested for possession of a handgun and drug paraphernalia, and was briefly incarcerated, then released. Following the arrest, Leon and Jean continued to inconsistently visit Ally with Jean appearing under the influence. Referrals for parenting programs continued to be made to the couple, but Leon and Jean never followed through. In September 2024, Leon completed the client information and consent form for therapy at Newsome Psychological Services and reported past use of cocaine and stimulants. Leon never followed through which such services.

On November 16, 2024, the court approved a permanency plan involving termination of parental rights and adoption. Soon after, Leon missed two

A-0295-25

substance abuse evaluations and declined to attend a third claiming that he was attending drug treatment through probation. Leon and Jean continued to visit Ally inconsistently.

In March 2025, Jean passed away. After her death, Leon attended visits more regularly and participated in a parenting program but continued to miss sessions and tested positive for amphetamines and methamphetamines in screens carried out in March 2025 and June 2025.

In May 2025, Leon underwent psychological and bonding evaluations with Marcia Baruch, Ph.D., and James Loving, Psy.D., which documented ongoing substance use, psychiatric symptoms, housing instability, and criminal history. Both experts observed interactions between Leon and Ally and between Ally and her resource parents.

Trial proceedings took place over four days in July and August 2025. Witnesses included DCPP's caseworker Jenna Scott, the resource parents, Dr. Baruch, and Dr. Loving. Leon did not testify or present any witnesses. On the first two days of trial, Leon left the trial mid-morning and did not return. On the final two days of trial, Leon was present.

Scott testified that she has been assigned to Ally's case since December 2024. Scott recounted the timeline and family history as well as the attempts to

6

provide Leon with help. Scott reported that before Jean's death, Leon's supervised visitation was inconsistent and they were with Jean, who was frequently showing up under the influence of drugs. Scott noted that Leon's mental health concerns and his previous criminal activity were the reasons that all visits with Ally were supervised. Scott noted that after Jean's death in March 2025, Leon's visits became much more consistent, but that Leon has never completed court-ordered substance abuse treatment, repeatedly tested positive for illicit substances, did not complete parenting classes, failed to find stable housing, and could not consistently hold a job.

Dr. Baruch was accepted as an expert in clinical and forensic psychology without objection. In May 2025, Dr. Baruch performed a bonding evaluation between Leon and Ally and the resource parents and Ally. Dr. Baruch found that Leon had untreated mental illness, suffers from drug abuse, had been involved with criminal activity throughout the years, and is homeless. Dr. Baruch found an insecure bond between Leon and Ally. She found that although the two enjoyed being together, there were some trust issues and anxiety on Ally's behalf when she was with Leon. Dr. Baruch found that there was a "very strong bond" between Ally and her resource parents. Dr. Baruch found that if Leon's parental rights were terminated, Ally would suffer very little harm;

A-0295-25

however, if Ally were removed from B.D. and H.D., she would greatly suffer separation anxiety and attachment issues that would affect relationships in the future.

Dr. Loving was found to be qualified as a clinical and forensic psychologist who performed bonding evaluations for Leon and Ally's resource parents. Dr. Loving diagnosed Leon with severe methamphetamine use disorder; adjustment disorder with depression and anxiety; and provisional diagnoses of cocaine use disorder; drug-induced psychotic disorder. Dr. Loving also ruled out schizoaffective disorder. Dr. Loving ultimately concluded that Leon could not provide Ally with a safe and stable home now or in the foreseeable future. Dr. Loving recommended that adoption by resource parents was in the best interest of Ally and that further delay in permanence of adoption could lead to emotional problems in the future.

B.D. and H.D. have been Ally's resource parents since she was twelve days old as she was suffering withdrawals. B.D. noted that DCPP informed the couple of their options from day one, explaining that the options were kinship legal guardian ("KLG") or adoption, what the difference was between the two, and they reviewed paperwork on the topic. Both parents expressed their desire

A-0295-25

to adopt, explaining that they believe that it would be in Ally's best interests as it could provide her with permanency, consistency, and a "normal childhood."

On September 5, the trial court rendered an oral decision and entered a Judgment of Guardianship, terminating Leon's parental rights to Ally and granting guardianship to DCPP for purposes including placement for adoption.

This appeal follows.

## II.

"Our scope of review on appeals from orders terminating parental rights is limited." N.J. Div. of Child Prot. & Permanency v. M.M., 459 N.J. Super. 246, 256 (App. Div. 2019). "We review the trial court's factual findings in accordance with a deferential standard," N.J. Div. of Child Prot. & Permanency v. D.C.A., 256 N.J. 4, 19 (2023), and its findings "generally should be upheld so long as they are supported by 'adequate, substantial, and credible evidence.'" M.M., 459 N.J. Super. at 256 (quoting N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014)). "We accord deference to fact[-]findings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). "[A] trial court's factual findings 'should not be disturbed unless they

9

are so wholly unsupportable as to result in a denial of justice.'" N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).

III.

"Parents have a constitutionally protected right to maintain a relationship with their children." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007). That right, however, "is not absolute" and is limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." F.M., 211 N.J. at 447. In guardianship and adoption cases, such as here, it is well-established that "[c]hildren have their own rights, including the right to a permanent, safe[,] and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). We acknowledge "the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." Ibid. Thus, a parent's interest must, at times, yield to the State's obligation to protect children from harm. See N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009).

To decide whether to terminate parental rights, a trial judge considers the four-prong best interests test:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [DCPP] has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

DCPP must prove the four prongs by "clear and convincing" evidence. N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 611 (1986). The prongs "are not discrete and separate; they . . . overlap . . . to . . . comprehensive[ly] . . . identif[y] a child's best interests." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). These considerations are fact-sensitive and require particularized evidence addressing the specific circumstances. Ibid.

A-0295-25

On appeal, Leon claims DCPP did not meet prongs one, two, or four of the best interest test. We disagree and address each argument in turn.

A.

To satisfy the first prong of N.J.S.A. 30:4C-15, there must be evidence that the parent caused the child harm. In re Guardianship of K.H.O., 161 N.J. at 348-49. While one single harm may be sufficient, "the focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development." Id. at 348. "In order to satisfy this prong," DCPP "need not 'wait until a child is actually irreparably impaired by parental inattention or neglect[,]'" but must only "demonstrate that the parental relationship has created a harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Div. of Youth & Fam. Servs. v. L.M., 430 N.J. Super. 428, 444 (App. Div. 2013) (quoting F.M., 211 N.J. at 449).

We are unpersuaded by Leon's claim that the court imputed Jean's actions and substance abuse to him and there was insufficient evidence to prove that Ally was at risk of physical or psychological danger. The court based its decision on the many choices Leon made that harmed his ability to parent Ally. These included his unresolved and untreated psychological issues, his

A-0295-25

continuously testing positive for methamphetamine, noncompliance with DCPP recommended programs, and his environmental instability.

As the court correctly stated, "[a] parent's inability to provide day to day nurturing for their child for a long period of time is a harm because it endangers the health and development of the child," which is supported by A.W., 103 N.J. at 604. Leon has not shown an ability to provide day-to-day nurturing for Ally. This delay has harmed Ally by postponing the possibility of permanent placement resulting in her securely attaching to the resource parents, causing her anxiety and emotional consequences if detached from them.

Leon also contends that his incarceration alone cannot be reason for termination of parental rights. This argument is belied by the record, which shows that the court relied on numerous factors in which Leon's actions led to Ally's harm.

B.

We are also unconvinced by Leon's claims that DCPP did not meet prong two. Leon's claim that he was willing to eliminate the harm facing Ally, as shown through his plan to complete his current drug treatment plan and to continue abstaining from drugs, is contradicted by the record. Leon has failed to eliminate any of the harms that have endangered Ally including untreated

A-0295-25

mental illness, criminal activity, substance abuse, homelessness, and unemployment.

Prong two requires there be parental unfitness, which can "be demonstrated [if] the parent is 'unwilling or unable to eliminate the harm' that has endangered the child's health and development" or "if the parent has failed to provide a 'safe and stable home for the child' and a 'delay in permanent placement' will further harm the child." K.H.O., 161 N.J. at 352 (quoting N.J.S.A. 30:4C-15.1(a)(2)). While prongs one and two are separate inquiries, they are related and "evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child." In re Guardianship of DMH., 161 N.J. 365, 379 (1999). Courts must assess: (1) whether parents have and are able to sufficiently ameliorate the risk of harm; and (2) if unremedied, whether the delay needed to address and lessen that risk will cause additional harm to the children. K.H.O., 161 N.J. at 348.

This prong focuses on the steps taken by the parents to maintain their relationship with the child and to foster an environment leading to healthy, normal child development. Id. at 352. Included in this analysis is whether the delay of permanent placement will add to the harm suffered by the child. Id. at 348. Permanency is favored over extended reunification efforts, as "[t]he trend

14

over the last thirty years has been toward foster care reforms that place limits on the amount of time a parent may have to correct conditions at home in anticipation of reunification." C.S., 367 N.J. Super. at116 (quoting K.H.O., 161 N.J. at 357-58). "[P]lacement plans must not lose sight of time from the perspective of the child's needs." K.H.O., 161 N.J. at 357. The second prong can be satisfied with a showing that the child will suffer substantially from a lack of stability and a permanent placement. M.M., 189 N.J. at 281.

Based on our review of the record, we are convinced the court correctly applied the second prong in finding that Leon demonstrated parental unfitness. The record shows that Leon has taken minimal steps to remedy his substance abuse and mental illness to ensure safety for Ally in his care. Dr. Baruch observed that Leon still had dangerous hallucinations in which he hears voices that tell him to hurt himself or others. Despite being recommended individual therapy to remedy this illness, Leon has chosen not to engage.

Moreover, the record supports the court's finding that a further delay in permanent placement would be harmful to Ally. Dr. Loving's expert opinion explaining that delaying permanency for Ally would likely cause possible future emotional and relationship issues and would be risky given Leon's "poor prognosis" for recovery, ongoing substance abuse issues, and the lingering

effects of his "meth-induced psychosis." Furthermore, Dr. Loving expressed that Ally should not "linger in limbo" while Leon continues his lack of sustained effort in sobriety. Leon's claims that his motel provides proper housing to Ally is irrelevant considering that he has not remediated his ongoing substance abuse and mental health issues.

C.

Despite Leon's claims that he was fully motivated and capable of strengthening his existing relationship with Ally and that termination of his parental rights would harm Ally, the court's finding that DCPP proved the fourth prong is amply supported by the record. After hearing testimony regarding Leon's failure to manage his substance abuse, his untreated mental health, criminal activity, homelessness, and unemployment, combined with the bonding evaluations of Dr. Baruch and Dr. Loving, the court properly found that terminating Leon's parental rights would not do more harm than good.

"[T]he fourth prong 'serves as a fail-safe against termination even where the remaining standards have been met.'" R.G., 217 N.J. at 559 (quoting N.J. Div of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 108 (2008)). "The question is . . . 'not whether a [birth] mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's

16

relationship with that parent.'" Ibid. (quoting E.P., 196 N.J. at 108). "[A] child's need for permanency is an extremely important consideration pursuant to this prong." Ibid. This analysis "cannot require a showing that no harm will befall the child as a result of the severing of biological ties." K.H.O., 161 N.J. at 355.

"If a child can be returned to the parental home without endangering [their] health and safety, the parent's right to reunification takes precedence over the permanency plan." N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 492 (App. Div. 2012) (citing N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 607-09 (1986)). However, children should not "languish indefinitely" in a resource placement while a parent attempts to correct parenting difficulties. N.J. Div. of Youth & Fam. Servs. v. S.F., 392 N.J. Super. 201, 209 (App. Div. 2007). Termination is necessary under certain circumstances to allow children to have a secure and permanent home. See N.J. Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 595 (App. Div. 1996) (holding that the "termination action was not predicated upon bonding but rather reflected [the child's] need for permanency and [the defendant's] inability to care for him in the foreseeable future").

Dr. Baruch and Dr. Loving both found that Leon's relationship with Ally, although positive, was an "insecure attachment." They both determined that if

17

Leon's parental rights were terminated, Ally would not suffer much harm. Meanwhile, both experts also found that if Ally was removed from her resource parents, she would experience serious emotional harm including attachment issues that could cause harmful long-term effects. Thus, the record supports the judge's findings by clear and convincing evidence.

For these reasons, there is no basis to second-guess the court's findings that termination of parental rights was in the children's best interests. To the extent we have not addressed any arguments raised by Leron, they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(A) & (E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-0295-25