**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2856-15T4
                A-2857-15T4

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

    Plaintiff-Respondent,

v.

E.B. and N.B.,

    Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF
N.P.B. and A.B.,
Minors.

_____

Submitted September 12, 2017 — Decided September 22, 2017

Before Judges Fisher and Moynihan.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FG-02-0040-15.

Joseph E. Krakora, Public Defender, attorney for appellant E.B. (Dianne Glenn, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant N.B. (Susan M. Markenstein, Designated Counsel, on the brief).

Christopher S. Porrino, Attorney General, attorney for respondent (Andrea M. Silkowitz, Assistant Attorney General, of counsel and on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Karen A. Lodeserto, Designated Counsel, on the brief).

PER CURIAM

Elena is the mother of two boys, Nathan and Alfred, born in May 2015 and January 2007, respectively; her husband, Noah, is their father.[1] The New Jersey Division of Child Protection and Permanency (the Division) filed a guardianship complaint naming both parents as defendants. The trial judge heard testimony over two days from three witnesses and entered a judgment of guardianship terminating defendants' parental rights and awarding guardianship to the Division.

Defendants' separate appeals were consolidated. Each defendant claims that the judge's conclusions were not supported by clear and convincing evidence. Noah also contends: the judge did not consider alternatives to termination "because other family members were willing and available to supervise visitation; he had recovered by the time of trial"; and the court ceded its duty to

---

[1] We utilize the trial court's pseudonyms for the parties and the children, to protect their privacy, and for the reader's convenience.

A-2856-15T4

determine the best interests of the children to the Division's expert who testified about the results of his evaluations of the parents and children. We find it necessary to remand this matter to the trial court with the direction that it supplement its findings of fact and conclusions of law, after considering evidence relevant to the bond between the boys and their parents and proffered evidence that the boys would not be allowed contact with their parents if termination was granted.

The judge's recitation of the applicable law evidenced that he understood the import of his decision to terminate the defendants' fundamental and highly protected parental rights. Santosky v. Kramer, 455 U.S. 745, 753-54, 102 S. Ct. 1388, 1394-95, 71 L. Ed. 2d 599, 606 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346-47 (1999). The Legislature has declared, as a matter of public policy, "[t]hat the preservation and strengthening of family life is a matter of public concern as being in the interests of the general welfare . . . ." N.J.S.A. 30:4C-1(a).

Parental rights, however, are not inviolable. N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986). "The balance between parental rights and the State's interest in the welfare of children is achieved through the best interests of the child standard." K.H.O., supra, 161 N.J. at 347. The Division

must prove the following four factors by clear and convincing evidence before parental rights may be terminated:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a); see also A.W., supra, 103 N.J. at 604-11.]

The standards "are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., supra, 161 N.J. at 348.

The trial judge heeded the mandate of the Court in conducting a fact sensitive analysis of the first three factors, specific to each defendant. Ibid.

As to the first statutory prong, the judge found both parents' "extensive history of substance abuse" related to their criminal involvement, including one incident when Noah and Elena were arrested after purchasing drugs while the boys were present, and for possessing stolen property.[2] That event prompted the Division to remove Nathan and Alfred. Both parents, in a subsequent court proceeding, stipulated that their actions resulted in the abuse or neglect of the children.

The judge considered subsequent arrests of both parents for other crimes, and their ensuing imprisonment, as well as Noah's enrollment in Drug Court just prior the court's decision in this matter. The judge found, from Elena's statement to Dr. Miller,[3] that the impetus for the parents' criminal behavior was their need for money to support Noah's drug habit. Other findings supported the judge's conclusion that the first prong was proven: both parents' failure to maintain sobriety; their positive drug tests;

---

[2] This incident was not sanctioned by any law enforcement agency as part of the parents' periodic role as confidential informants who performed purchases of controlled dangerous substances under the direction of police. We, therefore, find Noah's argument that the State was "complicit and a participant in the harm brought to the children" by using Noah "as a quasi-deputized operative and informant" is without merit. R. 2:11-3(e)(1)(E).

[3] Dr. Robert James Miller II, Ph.D., found by the court to be an "expert in psychology," conducted psychological evaluations of all four members of the family, and bonding evaluations between each parent and the boys. He was called by the Division to testify.

Elena's admission to Dr. Miller of the possibility that the boys witnessed intravenous drug use; and the parents' inability to secure stable housing.

The evidence found by the judge clearly and convincingly established the first prong of the statutory requirements for termination. Although there may have been a willingness to refrain from endangering the boys, the judge found neither parent had the ability to do so.

The judge's conclusions relevant to the first prong dovetailed with his findings supporting the second prong, a common occurrence resulting from the overlap of these two factors. N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006), certif. denied, 190 N.J. 257 (2007).

The judge detailed Noah's continued substance abuse, failure to complete substance abuse treatment programs, missed or refused drug tests, drug-related arrest, theft from his employer and concomitant arrest and eviction from his employer's residence, and failure to produce proof of his attendance at the AA/NA program he said he was attending in lieu of a treatment program. The judge observed Noah had "years to start the process" to reunify with his children, "but failed to do so." Noting that Noah's "early involvement with the Division was marked with disinterest and noncompliance," the judge found Noah's more recent attempts

to address his problems was "a case where too little has been far too late."

Likewise, the judge found Elena's long history with the Division included missed drug tests, professions of sobriety notwithstanding positive drug screens, arrests and incarceration during which she did not participate in services provided by the Division or visitation with the boys, and failure to participate in or complete treatment programs. The judge concluded from the evidence presented that Elena's "participation with the Division was marked with non-compliance, no progress and incarceration."

The boys' progress under the care of their paternal uncle and his wife, with whom they had been residing since their removal in August 2013, was a factor considered by the judge, and which supported Dr. Miller's opinion that, in the judge's words, "removing the children from the resource family would hinder the children's noticeable improvement and adversely affect their welfare." The judge balanced that progress and the parents' "continued issues"; we agree with his conclusion that there was clear and convincing proof the second prong was met.

The court, in considering evidence related to the third prong, noted both parents refused or failed to comply with the plethora of court-ordered services offered to both parents by the Division. He also reviewed the Division's consideration of familial options,

all of which were ruled out. The court found the best option was the one originally found by the Division: the boys' uncle who, with his wife, expressed his willingness to adopt the boys. We agree that there was clear and convincing evidence related to the third prong.

In considering the fourth prong, the judge acknowledged that it "serves as the final fail-safe against termination even where the remaining standards have been met." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 609 (2007). The judge weighed Noah's testimony — Elena did not take the stand — but concluded that nothing presented by him or on behalf of Elena "can surmount the overwhelming evidence that the best interest of the children demand termination." That "overwhelming evidence" was detailed by the judge and included the parents' failure to comply with the early recommendations made by Dr. Miller and the services provided by the Division that could have led to reunification. He also took note of the bond between the boys and their uncle and his wife as reported by Dr. Miller after he observed interactions among them. The court also considered the doctor's evaluations of Noah and Elena.

Contrary to Noah's argument that the judge "abdicated" his duty to make a best interest determination regarding the children, and "cut[] and paste[d]" Dr. Miller's opinions, the court evaluated

the testimony of all three witnesses and made specific findings regarding each of their testimony. He recognized the many recommendations and observations made by Dr. Miller, but it is clear the court made its own findings from all the evidence, including the uncontroverted expert opinions rendered by the doctor.

The determination of "whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster [or resource] parents," K.H.O., supra, 161 N.J. at 355, "is an expert judgment." In re Guardianship of J.N.H., 172 N.J. 440, 478 (2002). Bonding evaluations play an important role in this regard. In re Guardianship of J.C., 129 N.J. 1, 19 (1992). Psychologists and psychiatrists who perform the evaluations play a "critical role in reaching an ultimate decision in termination cases . . . ." Id. at 22.

The parties stipulated Dr. Miller was qualified as an expert in psychology and bonding. The judge particularly noted, "Dr. Miller has appeared many times in [his] courtroom and qualified in every instance as an expert." The judge found the doctor's "opinions were not disproved" and that his "conclusions were

reasonable and logical." He utilized the evidence presented by the doctor; he did not simply adopt it.

Dr. Miller's testimony raised interrelated issues we find were important to consider in determining whether termination would do more harm than good. He found the boys were bonded to each of their parents. He opined the boys would have "a significant emotional reaction" if they perceived they would never see their parents again if termination was ordered, and that it would "probably not be good" if they were barred forever from having contact with their parents. Dr. Miller said it was improbable that the resource family — the boys' uncle and aunt — would prevent any contact between the boys and their natural parents. Contrary evidence, however, was presented. A "contact sheet"[4] prepared by Division caseworker, Ashley Glover, who testified at trial, related the boys' uncle's statement to her that he would "not allow the parents in [the boys'] lives" if he adopted them. He would allow the boys to have a relationship with their parents only after they turned eighteen-years-old.

---

[4] The contact sheet was part of P-118, admitted in evidence on December 2, 2015 (defendants' joint appendix incorrectly indicates it was admitted on November 9, 2015). The record is not clear if the judge considered the contact sheet as evidence or if he found reason to exclude it; he told the attorneys he would disregard "objectionable hearsay" when he admitted a large number of contact sheets.

We find it necessary to remand this case for the judge to consider this and any other related evidence in the existing record, found pertinent and admissible, in determining whether termination would do more harm than good. We direct that the judge supplement his findings and conclusions, including any ruling on the admissibility of evidence. We note that the contact sheets contain embedded hearsay, including the uncle's statement to the caseworker about his intention to prevent the boys from seeing their natural parents.[5] We leave it to the trial judge to determine whether or to what extent he may require additional testimony, evidence or argument to determine the admissibility or weight of such evidence; of course, any ruling and the basis therefor should be set forth in the record. See Konop v. Rosen, 425 N.J. Super. 391, 402 (App. Div. 2012) (holding the basis for admission of each hearsay-within-hearsay statement must be separately considered).

The court's amplified decision shall be completed within thirty days. We retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

_____

[5] New Jersey Rule of Evidence 805 provides: "A statement within the scope of an exception to Rule 802 shall not be inadmissible on the ground that it includes a statement made by another declarant which is offered to prove the truth of its contents if the included statement itself meets the requirements of an exception to Rule 802."

A-2856-15T4