# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4777-15T3

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

T.M.T.,

    Defendant-Appellant

and

M.S.,

    Defendant.

_____

IN THE MATTER OF THE GUARDIANSHIP
OF J.E.T., a minor.

_____

        Submitted September 20, 2017 — Decided October 23, 2017

        Before Judges Fuentes, Koblitz, and Suter.

        On appeal from Superior Court of New Jersey,
        Chancery Division, Family Part, Hudson County,
        Docket No. FG-09-0112-16.

        Joseph E. Krakora, Public Defender, attorney
        for appellant (Catherine Reid, Designated
        Counsel, on the brief).

Christopher S. Porrino, Attorney General, attorney for respondent (Andrea M. Silkowitz, Assistant Attorney General, of counsel; Joyce Calefati Booth, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Todd Wilson, Designated Counsel, on the brief).

PER CURIAM

Defendant T.M.T. appeals from a Family Part order dated June 24, 2016 terminating her parental rights to her daughter, J.E.T. (Jill).[1]  We affirm substantially for the reasons set forth in Judge Lourdes I.  Santiago's comprehensive written opinion issued with the order.

T.M.T. is the biological mother of four children.  Jill, the oldest child, was born in October 2003.  T.M.T.'s parental rights to her other children, Gary, Carrie and Penny, were terminated in other proceedings.  We affirmed those terminations.  See N.J. Div. of Youth & Family Servs. v. T.M.T., No. A-4189-11 (App. Div.), certif. denied, 216 N.J. 363 (2013) (T.M.T.) and N.J. Div. of Child Prot. & Permanency v. T.M.T., No. A-4990-13 (Jan. 6, 2016).

Jill and her siblings were removed from T.M.T.'s care in 2008 by the Division of Child Protection and Permanency (Division) due

---

[1] We use fictitious names throughout the opinion to protect the children's privacy.  R. 1:38-3(d)(12).

to concerns about T.M.T.'s mental health when she claimed another woman's child was her baby.  T.M.T. was hospitalized for suicidal ideations, engaged in self-mutilation and "was diagnosed with alcohol abuse, depressive disorder and bipolar disorder."  T.M.T., supra, slip op. at 4.  The children remained in resource homes.

> [A] pattern of mental health issues and non-cooperation was repeated over the next several years.  T.M.T. repeatedly refused to cooperate with court-ordered drug testing, refused to let the assigned Division case worker inspect her home, and refused to allow psychologists or psychiatrists to evaluate her except on terms that she dictated.  She also denied that she was mentally ill, although she periodically experienced mental health crises.
>
> [Id. at 3-4.][2]

The first guardianship trial in 2012 involved Jill, Gary and Carrie.  The record supported the trial court's finding that "T.M.T. has chronic severe mental illness which she has not acknowledged or successfully addressed, and which preclude[ed] her from safely caring for her children."  Id. at 32.  We said that "[T.M.T.'s] failure to acknowledge or address her mental illness, and her resulting inability to care for her children has led to their extended stay in foster care."  Id. at 33.  We affirmed the

_____

[2] We cite to our unreported decisions because they involve the same party, T.M.T., and her children, although the other opinions refer to her as "T.T."

trial court's decision "that the Division proved the first three prongs of the best interest tests under [N.J.S.A. 30:4C-15.1(a)] by clear and convincing evidence as to all three children." Id. at 35.

The Family court terminated T.M.T.'s parental rights to Gary, who was to be adopted by his resource family. However, it denied termination of T.M.T.'s parental rights to Jill and Carrie. We affirmed those orders, agreeing that the Division had not proven the fourth prong of the statutory test with respect to Jill or Carrie. Ibid. Neither Jill nor Carrie had adoptive home placements at that time. The children were "at risk to remain in 'foster care limbo.'" Ibid. They needed therapeutic foster home placements to be ready to be adopted. At that time, T.M.T. was "their only continuing source of emotional support, even though she was incapable of parenting [the children]." Id. at 36.

We made clear that should the Division find adoptive parents for Jill and Carrie and if T.M.T. were still not able to parent the children, then the Division could refile for guardianship. The inquiry would then be to "address the children's current situation, T.M.T.'s current ability to provide them with

permanency, and if she has no such ability, whether there is a permanent adoptive home for each child."[3]  Id. at 36 n.7.

Jill has special needs.  Raymond Brown, the Division's caseworker, testified at the guardianship trial that Jill suffers from "boundary issues, some sexualized behaviors," "ADHD, power struggle[s]," "academic issues, [and] issues with her peers."  The Division placed Jill with "Family B" in April 2015.  This was Jill's sixth resource home.  T.M.T. had moved to Florida a year earlier and did not maintain contact with Jill.

In August 2015, the Division filed a guardianship complaint seeking to terminate T.M.T.'s parental rights to Jill.  On June 24, 2016, following three days of trial, Judge Santiago ordered the termination of T.M.T.'s parental rights.  In her written decision, she addressed each prong of the statutory test.

With regard to the first prong, the judge discussed T.M.T.'s "chronic and untreated mental health issues and her unwillingness to engage in services."  She found that Jill "has suffered instability and enduring harm by T.M.T.'s inability to provide her

---

[3] In 2013, the Division filed a guardianship complaint seeking the termination of T.M.T.'s parental rights to Carrie and T.M.T.'s new baby, Penny. We affirmed the 2014 termination of T.M.T.'s parental rights to these children in an unpublished opinion in 2016.  See N.J. Div. of Child Prot. & Permanency v. T.M.T., supra, No. A-4990-13.

with a stable home," thus making T.M.T. unable to offer Jill the potential of reunification. Regarding the second prong, the judge found that T.M.T. was unwilling to engage in required mental health treatment, making her unable to abate the harm to Jill. With regard to the third prong, the judge found that although the Division had been granted a "no reasonable efforts" order, it "continued to offer [her] services." T.M.T. was provided with "parenting classes, therapy, individual psychotherapy and medication monitoring." The Division assisted her in obtaining Section 8 housing, and "numerous referrals for therapy." T.M.T. was uncooperative, however. Her services were disrupted when she moved to Florida and would not provide the Division with an address. The Division ruled out other relatives for possible placement.

With respect to the fourth prong, the judge found the Division proved by clear and convincing proof that terminating T.M.T.'s rights to Jill would not do more harm than good. There was no evidence presented by T.M.T. that she had "made any improvements in her ability to parent or that she is interested in reunification with [Jill]." In the current home, there were resource parents willing to adopt her who could address any harm arising from terminating T.M.T.'s rights.

A-4777-15T3

On appeal, T.M.T. challenges the judge's finding that prong four was satisfied. She contends the Division did not meet its burden of showing that termination was in Jill's best interest, because it did not show by clear and convincing evidence that Jill may be adopted. T.M.T. also contends the judge was not impartial and that "she had pre-judge[d]" the case. We find no merit to these contentions.

"Our review of a trial judge's decision to terminate parental rights is limited." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). We must accord substantial deference to the findings of the Family Part due to that court's "special jurisdiction and expertise in family matters." Cesare v. Cesare, 154 N.J. 394, 413 (1998).

A parent has a fundamental right to enjoy a relationship with his or her child. In re Guardianship of K.H.O., 161 N.J. 337, 346-47 (1999). These rights "are not absolute," but are "tempered by the State's parens patriae responsibility to protect the welfare of children." Id. at 347. The standard by which the rights of the parents and the interests of the State in the welfare of the child are balanced is "through the best interests of the child standard." Ibid. Under that standard, an individual's parental

rights may be terminated if the Division establishes all of the following criteria:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a)(1)-(4).]

Each prong must be proven by the Division with clear and convincing evidence. N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 447 (2012).

Our 2013 decision affirmed the finding that the Division had proven all three prongs of the statutory test regarding T.M.T. That case involved Jill. In her 2016 opinion, Judge Santiago included findings that addressed each of those three prongs, even

though the first three prongs already were proven. T.M.T. has not appealed those findings.

T.M.T. challenges the judge's finding under the fourth prong of the statute. We are satisfied that there was sufficient credible evidence in the record to make this finding.

The fourth statutory prong requires the trial court to balance the harms suffered from terminating parental rights against the good that will result from terminating these rights. See K.H.O., supra, 161 N.J. at 363; see also N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 610-11 (1986). "The question to be addressed under [the fourth] prong is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents." K.H.O., supra, 161 N.J. at 355.

The trial judge's conclusion on the fourth prong was supported. Dr. Frank Dyer testified for the Division that Jill's current resource family was "viewed as being particularly good at caring for the more challenging children in the system." They were "absolutely committed" to adopting Jill.

Dr. Dyer conducted a psychological re-evaluation of Jill and a bonding evaluation between Jill and her resource mother.[4] Jill reported a "sense of safety and security in her resource home" and expressed a desire to live with the resource family. She was "beginning to form a genuine attachment to her current resource parents." Dr. Dyer testified that Jill would not suffer enduring harm if T.M.T.'s parental rights were terminated because the resource parents could ameliorate any harm. Jill would be placed at risk of harm if reunified with her mother.

T.M.T. is critical of the Division's proof because there was no first hand testimony from the resource family. However, we are satisfied the record supported the availability of an adoption opportunity for Jill. Jill remained with the family for more than a year despite behavioral issues that might have disrupted the placement. Other placements in the past failed because of Jill's behaviors. As Dr. Dyer testified,

> My overall impression is that [Jill] is exactly where she needs to be with caretakers who love and value her, who don't have ideas that she's possessed by a demon, no concerns that she's going to grow up to be schizophrenic. They're comfortable with her. They enjoy her. They're meeting her needs. The child is happy there. And this is really the ideal placement for her, in my view, which

---

[4] T.M.T. failed to attend the examination and bonding evaluation that were set up for her.

A-4777-15T3

is something that this girl deserves after five previous resource placements and a failed reunification.

T.M.T. never presented any evidence to the contrary about the supportive environment offered by the resource family.

T.M.T. is critical of Jill's placement because one of the children living with the resource family ran away. It is sheer speculation to intimate that conduct had anything to do with the resource family or Jill. We are satisfied there was substantial credible evidence in the record to support the court's finding that the fourth prong was satisfied.

T.M.T. contends the judge was not impartial, challenging the fairness of the decision. Our review of the record shows there is no basis whatsoever to this claim. There was no proof the termination decision was based on anything other than the evidence in the case, which amply supported the termination order. T.M.T. had notice and an opportunity to appear at the hearing; she was excused because of illness. Any conversation the judge had with T.M.T.'s sister was made in open court. Understandably, the judge questioned aloud T.M.T.'s mental health and behavior after T.M.T. first asked the judge at a pre-trial conference whether she spoke with "dead people" and then, when asked if she would accept service

of the complaint, told the judge to "take it and shove it," to "go to Hell" and then to "put that shit on the record."

After carefully reviewing the record and the applicable legal principles, we conclude that T.M.T.'s further arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4777-15T3