# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3722-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

L.A.G.-C.,[1]

     Defendant-Appellant,

and

D.F.M.M,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF
E.M.L.M.G., a minor.

_____

---

[1] We use initials or pseudonyms to protect the privacy of the parties involved in this appeal. R. 1:38-3(d)(12).

Argued May 12, 2021 – Decided June 28, 2021

Before Judges Fuentes, Rose and Firko.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FG-11-0029-19.

Ryan T. Clark, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Ryan T. Clark, on the briefs).

Nicholas Dolinsky, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jane C. Schuster, Assistant Attorney General, of counsel; Nicholas Dolinsky, on the brief).

Todd Wilson, Designated Counsel, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd Wilson, on the brief).

PER CURIAM

Defendant L.A.G.-C. (Lora) is the biological mother of E.M.L.M.G., (Erica), a little girl born in November 2017. Defendant appeals from the Judgment of Guardianship entered by the Family Part on May 18, 2020, terminating her parental rights to her daughter.[2] Defendant argues the trial judge

_____

[2] The Family Part also terminated the parental rights of Erica's biological father D.F.M.M. He did not independently challenge the court's judgment and is not a party to this appeal.

improperly permitted the Division of Child Protection and Permanency (Division) to present hearsay evidence to satisfy, by clear and convincing evidence, the grounds to terminate her parental rights under N.J.S.A. 30:4C-15(a). We disagree and affirm.

I.

Erica is defendant's third child. Her first daughter, J.A.G., was born in 2014; her son R.J.A. was born in 2015. Both of these children are in the custody of their biological father and neither are part of this appeal.

The Division's involvement in defendant's life began on May 18, 2016, when a "reporter" alleged defendant had left her then two-year-old daughter J.A.G and one-year-old son R.J.A. with a friend in a residence located on South Clinton Avenue in Trenton. The reporter claimed "[t]he mother has been prostituting herself . . . was fed up with the children and left . . . [them] with her . . . friend; she left the birth certificates, health insurances and other documents without any plans to return; and left no diapers or clothes." The friend "had to leave the [S]tate" and left the children with the reporter's mother.

According to the Division's Investigation Summary, Investigator Fitzgerald called the reporter to obtain more information about the children's welfare. The woman who answered the phone explained that she had called the

Division on her mother's behalf because her mother spoke only Spanish. The reporter told Investigator Fitzgerald that her mother is married to defendant's father. The children had been in the caller's mother's care for over two weeks. Approximately an hour after this telephone call, Division Investigators Fitzgerald and Chew responded to the location where the children were staying. Defendant was present with the children when they arrived. Because these two Investigators did not speak Spanish, Investigator Mercedes responded to the home to assist with interpreting.

The children did not have any visible injuries or bruises and "appeared to be clean and in good health at [the] time." The Investigation Summary further indicated that defendant "did not appear to be under the influence of any substances or alcohol[.]" She provided the Investigators with her social security number, and denied having: (1) any physical or psychiatric problems; (2) any current issues with or history of substance abuse; (3) any police involvement; and (4) any prior history with the Division. Defendant told the Investigators that the children's biological father was incarcerated at the time for domestic violence because he was physically abusive. She obtained a temporary restraining order against him, but "dropped it" shortly thereafter.

A-3722-19

Defendant was living with her brother and his fiancée at the time the Division investigated these allegations. She "denied that she told anyone that she didn't want her children or was fed up." She also denied "that she was prostituting" herself. Although she was unemployed, she was actively seeking permanent employment. In the meantime, she received public assistance in the form of $500 per month from the Supplemental Nutrition Assistance Program (SNAP) and $400 per month from the Temporary Assistance for Needy Families (TANF).[3] The Summary Report noted that defendant claimed "her brother agreed to care for his niece and nephew until his sister can get her own place or when their father is released from jail."

Defendant's brother told the Investigators that although she did not live with him, defendant came to visit the children and buy them food. The Summary Report's lengthy, well-documented analysis concluded on July 25, 2016, more than three months after the Division's initial response. It determined that the allegations of "Physical Abuse-Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare" against defendant concerning her then two infant children were "[n]ot [e]stablished."

---

[3] See Work First New Jersey Act, N.J.S.A. 44:10-55 to -70.

A-3722-19

On August 13, 2016, nineteen days after the Division completed its investigation and reached its final findings related to the May 18, 2016 incident, defendant brought her infant son to the emergency room of a hospital because he was having difficulty breathing allegedly due to aspirating milk. Division caseworker Fabiola Herrera testified at the guardianship trial that the child was admitted and remained hospitalized for three days. Herrera testified that the boy "had to be transferred to [the Children's Hospital of Philadelphia] . . . because he had broken ribs [and] bruises that were healing at different stages. [Defendant] was not able to provide an explanation of how that happened."

Division records noted the boy "was severely dehydrated and still having breathing difficulties." He had visible "bruising on both of his arms." Defendant told the hospital staff that three days earlier she "grabbed the child too hard because he was falling and she was afraid that he was going to hit his head." Her efforts proved to be ineffective because the child "sustained two small bumps on his head." According to the Division report, the boy's aunt arrived at the hospital shortly after defendant. The aunt told the Division caseworker that she suspected defendant's paramour D.F.M.M. was physically abusing the children. After further investigation, the Division concluded D.F.M.M. placed defendant's daughter J.A.G., and son R.J.A. "at risk of harm." With respect to

6

R.J.A., the Division found D.F.M.M. neglected him by not seeking timely medical attention and did not inform defendant of the incident that caused the child's injuries.

The Division ultimately found sufficient evidence to conclude defendant neglected the children "due to her inconsistent testimonies on who may have hurt her child[.]" On December 5, 2016, the Division removed the children from defendant's care and placed them in non-relative resource homes. Caseworker Herrera addressed this issue as part of her testimony at the guardianship trial:

> [I]t was determined that the kids were going to be removed because [defendant] was not able to provide an explanation of how [the injuries] happened. It was [defendant who] reported to the Division that she was at work when this happened. [D.F.M.M.] was watching [R.J.A.]. And when she came home there were concerns that he was not able to breath[e]. And that's how he end[ed] up at the hospital.

In February 2018, the Division placed both children in the custody of their biological father. As Caseworker Herrera explained, the biological father

> completed services. He was able to secure stable housing. The visits that were taking place at the time were appropriate. He . . . remediated . . . the concerns that the Division had when the removal happened. Right after he was released from jail he engaged in parenting services, anger management.

A-3722-19

Although defendant attended Division-sponsored parenting classes, her housing situation remained unstable. She also continued her romantic relationship with D.F.M.M., notwithstanding his failure to comply with any of the services ordered by the court.

II.

We next describe how defendant's activities led to the termination of her parental rights of her third child. The day after defendant gave birth to Erica in November 2017, Division caseworker Carmen Gonzalez responded to the hospital and spoke to the nurse who was present at the time. The nurse reported "'the birth was vaginal, last night . . . at 7 p.m.' The baby girl weighed [nine pounds and one ounce]." Defendant was breastfeeding the baby. The only person who had come to visit up to that point was defendant's paramour D.F.M.M., the baby's biological father.

Caseworker Gonzalez interviewed both parents to ascertain their current financial status and what plans they had for the care of their newly born daughter. Both parents said they did not have any money to buy diapers or any other necessities associated with the care of an infant. Defendant was unemployed and D.F.M.M. claimed he earned $3,000 per month working "in a roofing company for his friends." However, he did not have any money because,

8

two months earlier, he paid for his grandmother's airfare to fly from their native country, and visit him. He did not respond when Caseworker Gonzalez asked him why he did not save this money in anticipation of the baby's birth.

At caseworker Gonzalez's request, D.F.M.M. left the room to allow her to speak privately with defendant. Defendant told Gonzalez that she was expecting to receive $300 from her father "to help with rent," but she had been unable to communicate with him since a hurricane struck Puerto Rico.[4] With respect to domestic violence, the Division's contact sheet shows defendant assured caseworker Gonzalez that D.F.M.M. had "never hit [her]." She wanted him to be a part of the baby's life now that they were together.

Caseworker Gonzalez instructed the nurse and the hospital social worker "to not have the baby go home until [the Division] come[s] tomorrow." On November 3, 2017, when Erica was just three days old, the Division executed an emergency Dodd removal.[5] The contact sheet that documents the emergency

---

[4] Pursuant to N.J.R.E. 201(b), we take judicial notice that on September 16, 2017, Hurricane Maria, a Category 5 storm, devastated the northeastern Caribbean islands. Puerto Rico was particularly ravaged by this massive hurricane.

[5] A "Dodd removal" refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, which, as amended, is found at N.J.S.A. 9:6-8.21 to -8.82. The Act was authored by former Senate President Frank J. "Pat" Dodd in 1974.

removal of this healthy newborn girl was prepared by Division caseworker Karen Marin and approved by Supervisor Kimberly Noel. The Division provided the following explanation for taking this action:

> Despite attempts by [the Division] to work with the family regarding preparing for the arrival of [Erica], the family was not prepared with the necessary supplies to care for this child. The only items the family had were a few outfits and a sheet set. This coupled with the Established finding against [D.F.M.M.], for physical abuse of [defendant's] son and his lack of compliance in completing any services to address the underlying issues, [the Division] was not able to ensure the safety and welfare of this new baby.

Caseworker Marin also noted that defendant "was visibly upset and crying" when she signed the Dodd removal form that informed her of the date and time of the court hearing.

At the guardianship trial, the Deputy Attorney General (DAG) asked caseworker Herrera to clarify for the judge what plans the Division had for baby Erica at that time:

> A. The Division removed [Erica] on November 3rd. She was placed in a known-relative approved home with the Division.
>
> Q. And so what . . . was the plan with respect to [Erica]?
>
> A. At the time the plan was reunification with [defendant] and [D.F.M.M.].

A-3722-19

Q. What did the Division do . . . to attempt to execute this plan?

A. There were services that were court[-]ordered at the removal hearing. [Defendant] was court[-]ordered to do a psychological evaluation, engage in parenting classes, supervised visitation. And any recommendations by the psychological [evaluation]. And [D.F.M.M.] was part of the previous -- was part of the litigation before [Erica] was born, but he requested to be dismissed in May of 2017 because he said he was not the biological parent to either child. And he was dismissed from that litigation. So there were services that he was already . . . court[-]ordered to do before [Erica] was born. So when [Erica] was born he was required to do services in order for the Division to . . . move forward with the reunification plan.

At the start of December 2017, the Division referred both defendant and D.F.M.M. for psychological evaluations to determine the type of mental health services needed to help them care for their infant daughter. At the start of 2018, the Division arranged for them to attend parenting classes at the Mercer County Hispanic Association (MCHA). They received in-home parenting classes and had supervised visitation with Erica. The psychologist recommended both couple's counseling and individual counseling.

Individual counseling was provided as a form of intervention services through Catholic Charites. This organization did not require insurance, employed Spanish-speaking staff, and was a "walk-in," with no prior

11

appointment necessary. Caseworker Herrera first provided defendant and D.F.M.M. with information about Catholic Charites in the beginning of March 2018. D.F.M.M. did not participate. Defendant began attending these services three months later in June 2018. Catholic Charities referred her to Millhill services for individual counseling and anger management.

Defendant did not consistently participate in these services. The agencies involved ultimately notified the Division of her lack of progress. Caseworker Herrera testified:

> I called to check up how [defendant] was doing. But on October 30th . . . 201[8], they notified me that she was about to be terminated because of her low level of compliance with the service. By then they were not able to come up with a treatment plan for her because she was not really engaged in services.

Herrera contacted defendant and explained to her that if she missed her October 30, 2018, appointment, she was going to lose this opportunity to improve her life and regain custody of Erica. Herrera told her that "because of the limited Spanish-speaking relations, she was going to be put on a waiting list and that was not going to be beneficial because, basically, she was going to be without a service for a period of time." At that time, defendant was homeless and unemployed; her relationship with her other two children was not going well; and despite her denials, she remained romantically involved with Erica's

12

biological father D.F.M.M., a man who had been emotionally destructive to her and physically abusive to her two other children.

The Division also presented the testimony of Karen Garcia, an adoption caseworker, who works "towards the goal of adoption but also concurrently work[s] towards reunification." Garcia explained that this seemingly oxymoronic mission requires her to facilitate the adoption of a child who has been placed in a resource home of a family that may or may not be related to the biological parents, while at the same time providing services to those biological parents who may still be capable of turning "their case around."

Garcia testified that she first met defendant in December 2018, while the latter was working at Popeye's. Garcia testified that defendant quit this job approximately two weeks thereafter and told her she was "leaving for Puerto Rico in December" 2018. Consistent with her dual mission, Garcia arranged for defendant to undergo an updated psychological evaluation in February 2019, and referred her to parenting classes at Family Growth. This prompted the following exchange at trial:

> Q. We heard some testimony yesterday that there have already been other parenting courses, the Mercer County Hispanic Association courses and then courses at Legacy Treatment Services. Why was she being referred for yet another treatment provider . . . or parenting program?

A. So, I had contacted [the counselor at Legacy Center] in February of 2019 just to kind of get some clarity. She had told me that [defendant] did complete parenting classes through [MCHA] but they weren't effective. Apparently she couldn't prepare the [baby's milk] bottle properly and she had unrealistic expectations for [Erica].

So they recommended her for the, the Milestone Developmental Program, which she did complete. And then they recommended her for the STEP Program, which is their parenting classes, but she didn't attend any of the sessions. So, once, once she was discharged from Legacy, one of the recommendations was that she attend parenting classes. So then that's when I referred her to Family Growth.

According to Garcia, defendant "was going through a hard time" in April 2019. She went to Puerto Rico to be with her "very sick" father and stayed there until he died more than a month later. When she returned to New Jersey in May 2019, she had been discharged from the parenting skills program at Family Growth. In response to Garcia's suggestion, defendant re-enrolled in the program in June 2019. By September 18, 2019, the third day of the Guardianship trial, defendant had not completed the parenting skills program. Garcia made clear, however, that the program staff was still willing to work with her: "they didn't discharge her. They never mentioned anything about potentially discharging her. I feel like they were pretty understanding with her father's situation."

14

Between January 2019 and August 2019, defendant's employment was at best sporadic. After she left her job at Popeye's in December 2018, she remained unemployed until May 2019, when she began working for a cleaning company. She left that job a month later and remained unemployed until she began working as a cashier at a grocery store in August 2019. Although defendant produced a weekly paystub showing she worked forty-two hours one week, Garcia testified she was "not sure if she's working fulltime now."

With respect to housing, defendant resided at the Home Front shelter from February 2018 until she secured a suitable apartment with the assistance of the Board of Social Services in April 2019. Unfortunately, this arrangement proved to be short lived. At a case management conference held on July 9, 2019, the DAG represented to the court that defendant had not paid rent for the three months, amounting to $2,895. On July 2, 2019, the Special Civil Part, landlord-tenant court issued a warrant of removal that required defendant to vacate the apartment on July 3, 2019, but stayed the execution of the warrant to September 2019. However, the Board of Social Services again intervened on defendant's behalf and paid the entire rental arrears. Defendant eventually reduced her

15

monthly rent obligation by subletting one of the bedrooms in the apartment to another family.[6]

The next phase of the guardianship trial focused on defendant's relationship with Erica. In this context, the Division called Dr. Antonio Burr, who was admitted as an expert witness in psychology without objection. In addition to providing psychotherapy to private patients, his practice includes cases referred by the Division for psychotherapy and reunification between parents and children. At the Division's request, Dr. Burr conducted two psychological evaluations of defendant, the first on February 1, 2019, and the second on January 16, 2020.

Dr. Burr provided his initial findings and recommendations in a report dated March 20, 2019. His task was "to assess [defendant's] mental status and psychological state, as well as her attitude, capacity and disposition to provide a stable home and primary parenting to [Erica] in a safe and stable home environment free of substance abuse or domestic violence, according to normative standards of care and protection." Mindful that defendant's primary

---

[6] The record does not include a copy of defendant's lease. We note, however, that subletting a room in an apartment is not commonly allowed by landlords or sanctioned by municipal housing codes.

language is Spanish, it is important to note that Dr. Burr conducted his evaluations of defendant in Spanish, without an interpreter.[7]

Dr. Burr found defendant's "mood was calm [and] her affect was full range and appropriate to context." He also found no indication that her cognition and affect were compromised by psychopathology. Although her insight "was very limited and superficial . . . [h]er reasoning, social comprehension and judgment were adequate overall." She admitted that her relationship with Erica's biological father D.F.M.M., had been "very intense and very problematic." By contrast, defendant told Dr. Burr that she "had been cooperative and in compliance, and she is now ready to present herself separately[.]"

Despite what Dr. Burr characterized as her "compelling narrative," from a clinical perspective, he opined that defendant exhibited "several problems related to the current status of her rehabilitation . . . with substance abuse, domestic violence, psychological treatment, visitation, and with her overall ability to structure a stable living situation without major disruptions." Dr. Burr next saw defendant on January 16, 2020, for a follow up clinical assessment. In

---

[7] As part of the voir dire for his admission as an expert witness, Dr. Burr revealed the following particular feature of his educational background: "I grew up in Chile in South America where I graduated from high school and then I did two years of law school. I didn't continue my law education because of political circumstances and I moved to the United States where I was actually born."

a report dated January 26, 2020, Dr. Burr made the following comments with respect to her behavior:

> While it is noted that [defendant] made significant progress (since my first evaluation) in terms of her having obtained housing and part-time employment, and also on her attitude and demeanor in the way she related to [Erica] during the bonding evaluation, there are several areas of concern regarding the quality of her functioning, with implications regarding reunification and permanency.
>
> These concerns relate to her poor skills to manage stress, the matter of control of her anger and her behavioral impulsiveness <u>potentially, deriving in domestic violence, her continued documented substance abuse, and the matter of her poor adaptiveness in terms of planning, problem solving and decision making, all of which would impact on her parenting of [Erica]</u>.
>
> [Emphasis added.]

Dr. Burr reiterated these concerns when he testified at the guardianship trial. He also noted defendant's erratic behavior with respect to her contacts with Erica. His review of the Division's visitation logs indicated that her attendance actually decreased in 2019. Between December 2017 to December 2018, she had forty-two scheduled visits, but attended only twenty-six times. From February 2019 to December 2019, she attended seventeen out of forty-eight visits. This constituted only thirty-five percent of the total available

visitation opportunities.  Dr. Burr found the incongruity between her professed intentions and her actual performance revealed a troubling pattern of instability. He explained:

> [T]here is an issue that I believe, from a clinical point of view, is fairly central and that is the matter of the ability to regulate one's moods and affects in order to engage in behaviors that are conducive to your purpose. And in this case, clearly, this was not the case . . . . I discussed with [defendant] the issue of planning for the child were the child to be reunited with her.
>
> . . . .
>
> [T]he context of that inquiry is that when the child was removed at birth [defendant] was entirely unprepared for the child.  She did not have the minimum resources -- diapers, a place to live . . . a [car] seat, anything . . . to receive the child. And the Division considered that sufficient cause to remove the child.
>
> Two years later the question of how are you planning [to meet] the . . . child['s] needs, again, [defendant] presented . . . not a very elaborate plan which included, you know, taking the child to childcare then . . . she would hire somebody to pick the child from childcare, take her to her home, the babysitter's home.
>
> . . . .
>
> And [defendant], as we discussed it, saw that this was not really a plan conducive to promote the stability of a child; that she would have to rethink and she would have to consider the matter further.  And . . . she seemed rather surprised that this would not be a plan because she really hadn't thought about it.

19

Dr. Burr opined that defendant did not have the ability to address these problems and was not capable of coping with this stress. He found she did not have the skills to manage her moods or address the issues he identified that resulted from her relative inability to manage or regulate her moods or affects. For these reasons, Dr. Burr did not support reunification between Erica and her biological mother.

On the issue of bonding, Dr. Burr found defendant was affectionate but passive and inactive. She essentially watched Erica during the visiting session instead of initiating interactive contact with the child. Although Erica was familiar with defendant, the attachment appeared to be derivative as opposed to grounded in a genuine parent-child bond. Dr. Burr noted that defendant was more active with Erica during the second bonding evaluation on January 16, 2020. She was affectionate and physically engaging. She sat on the carpet with her toys and helped Erica play with them. Although the relationship was affectionate this time and more positive, Dr. Burr did not find the type of strong bond expected between a parent and child.

Dr. Burr's bonding evaluation between Erica and her foster parents was noticeably different. He described Erica's foster parents as extremely attentive, very caring and actively affectionate. Dr. Burr found the foster parents

20

promoted a variety of age-appropriate developmental behavior, such as language skills that included child-relevant sounds and words which they modeled for Erica. Dr. Burr opined that Erica had bonded with the foster parents and they had become her psychological parental figures. Without objection, Dr. Burr testified that the foster resource parents expressed to him their desire to adopt Erica.

Dr. Burr opined that defendant was not capable of providing Erica with a stable and predictable home environment. This is illustrated in the following responses to the DAG's questions:

> Q. Do you have an opinion on whether [defendant] has the skills necessary to mitigate any of the harm you were discussing that, that could occur to the child if she were removed from the current resource parents?
>
> A. I don't . . . think she has the skills. I don't think [defendant] -- although she's a very nice person[,] I don't think she has the insight to understand what the child would be going through. I don't think that she has the necessary elaboration in her thinking to ameliorate the harm the child would sustain if separated from these foster parents with whom she has formed a very, very significant bond.

The DAG also asked Dr. Burr whether he believed the foster parents had the skills and sensitivity necessary to protect the child from any emotional

21

trauma caused by the termination of defendant's parental rights. Dr. Burr opined

that the foster parents were prepared to meet this challenge:

> A. Based on my observation of them in the bonding evaluation, I do think that they have the skills, the insight, the language, the . . . ability to articulate for the child what . . . the parenting situation is. And I think that in my experience, and I think in every situation of adoption children will have questions. Whether they have them now . . . it's not likely that [Erica] would have questions now -- but in the future, as they develop, as they grow into adults . . . who have been adopted even in successful adoptions always have questions about their parentage, why they weren't parented by their biological parents, what happened. They want to know the story.
>
> And it is very, very important that the persons who have adopted have that capacity to answer those questions, to engage in that conversation . . . with the child.
>
> Q. And do you believe that these resource parents have the ability to engage with . . . the child?
>
> A. I do.

The DAG also recalled caseworker Karen Garcia to document the various

family members and individuals associated with defendant the Division

contacted to determine whether any of them had an interest in taking care of

Erica. Caseworker Garcia described these documents as "rule out letters."

> Q. What's a rule out letter?

22

A. It's after we've reached out to a family member or a friend, well, pretty much anybody that the client has given us their name and phone number regarding placing the child with them while the child is in our custody. If they rule[] themselves out, they expressed for any reason that they can't take care of the child then we send out a rule out letter just explaining when we had the conversation with them and their reasoning as to why they're being ruled out after the conversation we had with them.

Caseworker Garcia testified she contacted Erica's biological paternal uncle H.M., and R.M., Erica's paternal grandmother and her paramour P.M., to determine whether they wanted to be evaluated for Erica's possible placement with them in Ecuador. None of these individuals expressed any interest in assuming reasonability for Erica's care and safety. Caseworker Garcia also testified concerning the results of defendant's substance abuse evaluation conducted in November 2019. The Board of Social Services reportedly closed defendant's case after she missed "two or three appointments." Four substance abuse screenings of defendant's urine taken in January 2020 tested positive for marijuana. The Division again referred her to outpatient treatment.

Defendant testified on February 5, 2020 at the Guardianship trial with the assistance of a court-certified Spanish language interpreter. In response to her attorney's questions, defendant stated that she had an apartment with a separate room for Erica. She described it as "a big room. It's wide, big. It's decorated.

23

It has her diapers, her belongings, a table for her to eat, plates. She has clothing." She worked from three to nine o'clock but was willing to work part-time in order to care for daughter. She also mentioned that she shared the apartment with a man she described as her boyfriend. He knew that she wanted Erica to live in the apartment and was willing to help her "financially" and with "transportation" because he had a car.

On cross-examination, defendant clarified that she worked for a supermarket for the past seven months. Before this job, she was unemployed and fell three months behind on her rent. She avoided eviction with the assistance of the Board of Social Services. Her boyfriend worked in the supermarket's meat department.

## III.

The judge who presided over the Guardianship trial issued a fifty-six-page memorandum of opinion on May 18, 2020. The first forty pages of the memorandum consists of a recitation of the testimony of the witnesses, a brief description of some of the documents admitted at trial, a list of the twenty-nine exhibits presented by the Division, followed by a list of the five exhibits presented by the Law Guardian. The next eleven pages contain a description of the four statutory prongs in N.J.S.A. 30:4C-15(a) and the cases that have

24

reaffirmed the Division's obligation to prove, by clear and convincing evidence, that termination of defendant's parental rights is warranted.

The judge's analysis of the case against defendant does not begin until page forty-two. He wrote that prong one requires the Division to prove by clear and convincing evidence that "[the] child's safety, health or development has been or will continue to be endangered by the parental relationship." N.J.S.A. 30:4C-15.l(a)(l). Against this statutory standard, the judge made the following finding:

> Here, it is evident that [Erica's] safety, health or development has been and will continue to be endangered by the parental relationship with [defendant]. [Defendant] did complete some of the services that the Division required of her as evidenced by the certificates of completion. That being said, she never demonstrated sufficient stability to justify [Erica's] return to her care. She had issues securing stable housing, she was unable to maintain employment, she frequently missed supervised visits and/or failed to confirm them [twenty-four] hours in advance, and her psychological evaluations showed that she was unable to handle the stresses of everyday life and parenting. Moreover, [defendant] repeatedly abused marijuana in an attempt to cope with her stress, and no testimony or evidence was offered during this trial to prove that she recovered from her substance abuse issues.

The second prong of the best interests' standard under N.J.S.A. 30:4c-15. l(a)(2) relates to parental unfitness. The Division must prove, by clear and

25

convincing evidence, that defendant is unwilling or unable to eliminate the harm Erica faces if she is allowed to be in her care and custody. Alternatively, the Division may prove that defendant is unwilling or unable to provide a safe and stable home for this three-year-old child and delay in finding a permanent placement will exacerbate her harm. In re Guardianship of K.H.O., 161 N.J. 337, 352 (1999). However, there is also a countervailing constitutional principle that "'clearly favors keeping children with their natural parents and resolving care and custody problems within the family.'" N.J. Div. of Child Prot. and Permanency v. R.L.M., 236 N.J. 123, 144 (2018), (quoting N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 165 (2010)).

The judge found the Division met its burden of proof related to parental unfitness under N.J.S.A. 30:4c:15. l(a)(2).

> [Defendant's] approach to this litigation and to her relationship with her child demonstrated that she is unable to eliminate the harm facing [Erica] and is unable to provide a safe and stable home for her. [Defendant] has a lengthy history with the Division and had two children removed from her care prior to [Erica]. Because of this, [defendant] was on notice from the time that she was pregnant with [Erica] that she would have to properly prepare for the baby's arrival or she would likely be removed from her care. Upon [Erica's] birth, [defendant] was not prepared, had no money saved, and limited baby supplies. The Division continued to assist [defendant] to help her reunify with [Erica]. Although she did engage in some services, she

A-3722-19

ultimately failed to meaningfully and consistently comply with Division requests and court orders, [defendant] had a consistent pattern of missing supervised visits, losing or failing to secure employment, and abusing marijuana to cope with day-to-day stressors.

Furthermore, a delay in securing permanency for [Erica] will only add to her harm. Since birth, she has been placed in one resource home. Her resource parents have made clear to the Division that they are willing to adopt her. A bonding evaluation concluded that [Erica] identifies her resource parents as her real parents.

The third prong requires the Division to make reasonable efforts to provide services to help defendant correct the circumstances which led to Erica's involuntary removal and placement outside the home. The court must consider the alternatives to termination of parental rights. N.J.S.A. 30:4C-15.1(a)(3). The United States Supreme Court has noted that this phase of the termination of parental rights trial often requires expert testimony from mental health professionals. See Lassiter v. Dep't of Soc. Servs., 452 U.S. 18, 30 (1981) ("[T]he ultimate issues with which a termination hearing deals are not always simple . . . . Expert medical and psychiatric testimony, which few parents are equipped to understand and fewer still to confute, is sometimes presented.")

Here, the trial judge found the Division proved by clear and convincing evidence "that it made reasonable efforts to provide services to assist

[defendant] in having [Erica] returned to her care." Dr. Burr's testimony described at length the services made available to defendant. He also assessed defendant's level of participation as well as the effectiveness of the various programs intended to address her substance abuse problem and provide her with basic parenting skills. Despite defendant's initial willingness to cooperate with and participate in these services, Dr. Burr opined that she was unable to sustain the required level of commitment.

The Division also investigated the possibility of placing Erica with members of her paternal family as alternatives to termination of defendant's parental rights. These efforts proved to be futile. The Division's mission is to explore all possibilities while mindful that time is of the essence. Our Supreme Court has made clear that in guardianship cases, "the child's need for permanency and stability emerges as a central factor." K.H.O., 161 N.J. at 357.

Finally, under prong four, the judge must determine whether the termination of parental rights will not do more harm than good. N.J.S.A. 30:4C-15.1(a)(4). Here, the trial judge found the Division established, by clear and convincing evidence, that termination of defendant's parental rights to Erica would not do more harm than good. The judge noted that Dr. Burr's bonding evaluations showed Erica emotionally bonded with her resource family and

28

views the two parental figures as her true parents.  By contrast, Dr. Burr opined that defendant was unable to cope with the everyday stressors associated with life and parenting responsibilities.  The judge found Dr. Burr was a credible witness and accepted his reports and testimony as competent evidence.

As an appellate court, our standard of review of a Family Part's order terminating parental rights is limited.  In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002).  We are bound to uphold the trial court's factual findings when they are supported by adequate, substantial, and credible evidence.  N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008).  We defer to the trial court's credibility determinations "because it has the opportunity to make first-hand credibility determinations about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record."  Ibid.  Finally, due to its specific jurisdiction, the Family Part has developed a "special expertise in the field of domestic relations" that warrants deferential review of matters predicated on factual findings.  Cesare v. Cesare, 154 N.J. 394, 412-13 (1998).

In this light, we discern no legal basis to disturb the final Judgment of

Guardianship entered by the Family Part terminating defendant's parental rights to her biological daughter.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION