# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0593-21

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

C.T. and M.H.,[1]

     Defendants,

and

B.G.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF N.E.T.,
A.B.J.G. and B.J.G., JR., minors.

_____

Submitted September 12, 2022 – Decided September 21, 2022

---

[1] We use initials and pseudonyms to protect the family's identity. R. 1:38-3(d)(12) and N.J.S.A. 9:6-8.10a(a).

Before Judges Mayer and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FG-04-0156-21.

Joseph E. Krakora, Public Defender, attorney for appellant (Daniel A. DiLella, Designated Counsel, on the briefs).

Matthew J. Platkin, Acting Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Julie B. Colonna, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors A.B.J.G. and B.J.G., Jr. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; David B. Valentin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant B.G. (Bob) appeals from an October 6, 2021 judgment of guardianship after a trial terminating the parental rights to his biological children, A.B.J.G. (Ann), born in February 2010, and B.J.G., Jr. (Ben), born in June 2012.[2] On appeal, Bob challenges the decision by Judge Francine I.

---

[2] The children's biological mother, C.T., surrendered her parental rights regarding Ann and Ben to the relative resource parent and maternal cousin, R.L. (Rachel). M.H. is the biological father of N.E.T., born in April 2004. M.H. and C.T. surrendered their parental rights regarding N.E.T. to Rachel. Because she is eighteen years old, N.E.T. is not participating in this appeal. Further, C.T.

Axelrad terminating his parental rights after finding the New Jersey Division of Child Protection and Permanency (Division) satisfied all four prongs of the best interests of the child test, N.J.S.A. 30:4C-15.1(a).

Based on our review of the record and applicable law, we are satisfied the evidence presented by the Division overwhelmingly supports Judge Axelrad's decision to terminate Bob's parental rights. Thus, we affirm for the reasons stated by Judge Axelrad in her comprehensive oral opinion on October 6, 2021. We add the following comments.

Under N.J.S.A. 30:4C-15.1(a), the Division must satisfy the following prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

and M.H. are not participating on appeal because they surrendered their parental rights.

3

(4) Termination of parental rights will not do more harm than good.

These prongs overlap "to provide a comprehensive standard that identifies a child's best interests." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). "The considerations involved are extremely fact sensitive and require particularized evidence that address[es] the specific circumstances in the given case." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 554 (2014). The Division must prove all four statutory prongs by clear and convincing evidence. Ibid.

At the time of trial, Bob resided in a facility in Maryland and the matter proceeded by Zoom due to COVID-19 restrictions. The Division and Judge Axelrad afforded Bob every accommodation to ensure his full participation during the proceedings as if he were present in the courtroom with his attorney.

Rather than recite the history of the Division's lengthy involvement with this family, we incorporate Judge Axelrad's detailed factual findings. We provide a short summary of the trial evidence.

The Division has been involved with the family for many years. The reported incidents leading to the Division's involvement and removal of the children included domestic violence and substance abuse by C.T. and Bob.

A-0593-21

Bob was first incarcerated in 2014. The Division was unable to reach Bob from 2013 through 2017 except when he contacted the Division. Bob was in and out of jail in 2017. In 2018, Bob moved to Georgia and had no contact with his children. In December 2018, Bob contacted the Division and expressed an interest in caring for Ann and Ben.

Both children have behavioral and educational issues requiring special services. At no time did Bob make any effort to assist Ann or Ben in addressing their specific educational and behavioral needs, although he knew the children required and received services to overcome their deficits.

In March 2019, the Division placed Ann and Ben with a maternal cousin, R.L. (Rachel). Rachel readily participated in the services necessary to address the children's issues and continues to do so.

Rachel discussed Kinship Legal Guardianship (KLG) and adoption with the Division several times. After explaining the options, Rachel stated she wished to adopt the children and understood the differences between KLG and adoption. During the trial, Rachel testified it was essential that Ann and Ben have stability in their lives and she wanted to adopt the children to provide them the necessary permanency and stability. Rachel also expressed a willingness for the children to maintain contact with their biological parents.

A-0593-21

In or about 2019, Bob moved to West Virginia and lived with his girlfriend and their newborn child.[3] When Bob was in West Virginia, Rachel facilitated video calls with the children. However, Bob failed to maintain any consistency in his communications with the children while he lived in West Virginia.

Because Bob moved to another state, the Division required a home assessment prior to considering Bob's request for custody of Ann and Ben. The Division requested an out-of-state assessment be performed regarding Bob's living situation in West Virginia. Before that assessment commenced, in June 2020, Bob relocated to another address in West Virginia, necessitating the need for a new home assessment.

Around the same time, Bob faced federal charges for drug distribution and was incarcerated on those charges in July 2020. He was convicted on the federal charges in April 2021 and sentenced to serve thirty-seven months in prison. At the time of trial, Bob's anticipated release date on the federal drug charges was May 2022.[4]

---

[3] Bob's girlfriend had five other children when she gave birth to Bob's child.

[4] There is information in respondents' briefs suggesting Bob's release date is October 2022.

A-0593-21

Rachel offered to continue facilitating communications between Bob and the children while Bob was incarcerated. However, Bob only had fifteen minutes per week for telephone communications. Bob explained he was unable to use that time each week to speak with the children because he had other matters requiring the use of his telephone time allotment.

At trial, the judge heard testimony from Dr. Alan Lee, a licensed psychologist, who performed bonding evaluations and psychological evaluations. The judge relied heavily on Dr. Lee's testimony, finding his testimony clear, candid, and credible. Moreover, Dr. Lee's opinions were not rebutted by any contrary expert testimony. The judge also heard testimony from the Division's adoption caseworker and Bob. However, Bob did not submit any documentary evidence or expert testimony.

Judge Axelrad set forth her fact findings and legal conclusions in support of the Division's satisfaction by clear and convincing evidence as to each of the four prongs.

Under the first prong, Judge Axelrad found the health, safety, and development of the children was at risk based on Bob's criminal recidivistic behaviors, untreated mental health and aggression issues, and continued battle with drugs. She explained Bob "has a history of impulse control problems, anger

issues, aggression and violence.  He remains at a heightened risk for criminal recidivism."

The Division's psychological expert, Dr. Alan Lee, described Bob's substance abuse history beginning at age twelve.  Bob failed to complete various treatment programs to address his substance abuse.  While in prison, Bob received some treatment for his substance abuse problem.  However, Dr. Lee believed Bob agreed to participate in the substance abuse program hoping to receive a reduction on his sentence.  Dr. Lee opined Bob has a potential for relapse, lacks genuine motivation for personal change, and limited knowledge of parenting and child-rearing.

Dr. Lee also testified Bob has a history of violence and mental health issues.  Despite recommendations that he participate in anger management programs, family therapy, substance abuse programs, parenting skill classes, and a vocational assessment, Bob did not follow through with these recommendations.[5]  The doctor opined Bob has impulse control issues, anger issues, and displays aggressive and violent behaviors.  With these traits, Dr. Lee stated Bob was at a heightened risk for criminal recidivism.  Dr. Lee also

---

[5] Judge Axelrad noted Bob was not incarcerated in 2017 and 2018 and thus had ample time to engage in the recommended services.

A-0593-21

explained Bob's unaddressed issues raised concerns regarding his ability to be even a minimal caretaker to Ann and Ben at the time of trial or in the foreseeable future.

Judge Axelrad found the doctor's opinions were not predicated upon Bob's incarcerated status and his opinions would be the same if Bob had not been in prison. Based on the doctor's testimony, the judge concluded Bob's recidivism for criminal conduct must be considered in analyzing the harm to the children. Thus, Judge Axelrad found the Division satisfied the first prong favoring termination of Bob's parental rights.

Similarly, under the second prong, the judge found Bob was unwilling or unable to eliminate the harm to Ann and Ben. Both children suffer from educational and behavioral issues requiring special services. Bob never assisted the children in addressing their specific needs. However, Rachel actively participated in the services offered to assist the children in overcoming their issues.

Further, by declining to participate in services, the judge explained Bob failed to provide any stability for his children. Even when Bob was not in prison, Bob did little to nurture or care for Ann and Ben. Further, when Bob is released from prison, he admitted he would be unable to care to his children for at least

a year. Thus, the judge held the Division proved Bob is unable or unwilling to eliminate the harm facing the children and the delay of permanent placement for the children would add to the harm suffered.

Under the third prong, the judge found the Division made reasonable efforts to assist Bob despite his incarceration. The Division located Bob while he was in prison and kept him apprised of the status of the litigation once the Division obtained Bob's contact information. The Division also offered to facilitate telephone communications between the children and Bob during his period of incarceration because the prison would not allow in-person visits during COVID-19. Despite the Division's efforts, the judge noted Bob never called Rachel to speak with the children while he was incarcerated. The Division also explored services for Bob while he was imprisoned but the prison declined to offer services to inmates during COVID-19.

In his bonding evaluation, Dr. Lee concluded the children lacked any significant or positive bond with Bob. According to the testimony, Dr. Lee found the children displayed an ambivalent and insecure attachment to Bob. Thus, the doctor found there was a low risk of the children suffering severe and enduring harm if Bob's parental rights were terminated.

A-0593-21

On the other hand, Dr. Lee found the children had a secure and positive bond with Rachel, whom they had lived with since March 2019. He explained Rachel unequivocally wanted to adopt the children and the children wanted to be adopted by Rachel.

On alternatives to termination, under the third prong, the judge found Bob never offered his sister as a suitable relative placement. Judge Axelrad held the Division discussed the available options with Rachel and she expressed her preference for adopting the children. Importantly, the judge noted the Division clarified the Division had the same role regarding the children whether Rachel elected KLG or adoption.

KLG is an alternative that allows a relative to become the child's legal guardian and commit to care for the child until adulthood, without stripping the parents of their rights. N.J. Div. of Youth & Family Servs. v P.P., 180 N.J. 494, 508 (2004). The Legislature created KLG, finding "an increasing number of children who cannot safely reside with their parents are in the care of a relative or a family friend who does not wish to adopt the child or children." N.J. Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 222-23 (2010).

Prior to July 2, 2021, KLG was considered "a more permanent option than foster care when adoption '[was] neither feasible nor likely.'" P.P., 180 N.J. at

512-13 (emphasis added) (quoting N.J.S.A. 3B:12A-6(d)(3) to (4)).  On July 2, 2021, the Legislature enacted L. 2021, c. 154, which removed the KLG requirement that adoption be "neither feasible nor likely." P.P., 180 N.J. at 512-13 (quoting N.J.S.A. 3B:12A-6(d)(3) to (4)).  Under the amended statute, KLG may be a valid defense to the termination of parental rights, even when adoption is available as an option.  See N.J.S.A. 3B:12A-5.

Here, Judge Axelrad's determination is consistent with the 2021 amendments to the KLG statute as adoption may still be considered under the amended KLG statute.  The judge concluded Rachel understood the KLG alternative after discussions with the Division.  Based on those discussions, Rachel unequivocally rejected KLG, stating she wished to adopt the children.  Having reviewed the record, we are satisfied Judge Axelrad aptly concluded Rachel's adoption of the children was the most appropriate option because Rachel would provide a realistic chance for the children to achieve a permanent and stable home environment.

With respect to the fourth prong, the overriding consideration is the child's need for permanency and stability.  See In re Guardianship of K.H.O., 161 N.J. 337, 357 (1999).  "The question to be addressed under [the fourth] prong is whether, after considering and balancing the two relationships, the child will

suffer a greater harm from the termination of ties with [the child's] natural parents than from the permanent disruption of [the child's] relationship with [the child's] foster parents." Id. at 355.

In weighing any potential harm arising from terminating a parent's rights, a court must consider expert testimony. In re Guardianship of J.C., 129 N.J. 1, 25 (1992). "[W]here it is shown that the bond with foster parents is strong and, in comparison, the bond with the natural parent is not as strong, that evidence will satisfy . . . N.J.S.A. 30:4C-15.1(a)(4)." K.H.O., 161 N.J. at 363.

Based on the unrefuted expert testimony of Dr. Lee, Judge Axelrad concluded there was sufficient credible evidence that termination of Bob's parental rights would not do more harm than good. Based on the evidence and testimony, Judge Axelrad properly concluded Rachel, who was the children's psychological parent since 2019, would provide a stable and permanent home for the children.

Moreover, under the specific facts in this case, Judge Axelrad rejected Bob's argument that the Division used his incarceration to justify termination and failed to provide reunification services simply because he was in prison. The judge held that once the Division learned of Bob's incarceration, the Division facilitated Bob's participation in the litigation, kept Bob apprised of the

13

children's status, and informed him of Rachel's decision to adopt the children instead of KLG.

Having reviewed the record, in light of the overwhelming and uncontradicted evidence, we are satisfied Judge Axelrad correctly concluded the Division presented clear and convincing evidence in support of termination of Bob's parental rights under N.J.S.A. 30:4C-15.1.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0593-21